COLUMBIA BANK FOR COOPERATIVES, Appellant,

v.

H. Kenneth LEE, Trustee in Bankruptcy, Appellee.

In the Matter of FARMERS FEDERATION COOPERATIVE, INC., Bankrupt.

No. 10255.

United States Court of Appeals Fourth Circuit.

Argued April 6, 1966.

Decided Oct. 4, 1966.

Rehearing Denied Nov. 23, 1966.

Edwin P. Gardner, Columbia, S. C. (John F. Shuford, Asheville, N. C., and Robert A. Hope, Columbia, S. C., on the brief) for appellant.

Thomas A. Uzzell, Jr., Asheville, N. C. (Frank M. Parker, Uzzell & DuMont, and Parker, McGuire & Baley, Asheville, N. C., on the brief) for appellee.

Francis Shackelford, Atlanta, Ga. (Alston, Miller & Gaines, Atlanta, Ga., on the brief) for Cotton Producers Association as amicus curiae.

Before SOBELOFF and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

SOBELOFF, Circuit Judge:

This is a case of first impression involving the relation of the Farm Credit Act to bankruptcy proceedings.

Farmers Federation Cooperative, Inc., (hereafter Federation) was adjudicated a bankrupt in February, 1963, and appellee H. Kenneth Lee was appointed trustee. Federation then owed approximately $162,000 to the Columbia Bank for Cooperatives (hereafter the bank), secured by mortgages and deeds of trusts on certain property of the bankrupt. By agreement of the trustee and the bank, some of this secured property was sold, and the proceeds—about $167,000—were deposited in a special account pending further order.

In addition to the mortgages and deeds of trust, the bank was also entitled by statute to a lien on certain stock issued by it to Federation pursuant to the Farm Credit Act, 12 U.S.C. § 1134d(c) (1958). The referee in bankruptcy found that in the hands of the bank this lien was worth the full par value of the stock, $113,120.82, but that because of its limited marketability, the amount realizable in a sale by the trustee would be much less.

Consequently, the referee ordered Federation to surrender the stock to the bank for a credit against Federation's indebtedness calculated on the basis of the value of the stock to the bank. The District Court affirmed the referee's order and dismissed the bank's petition for review.

I

In order to understand the issues, it is necessary first to outline the structure and operation of the Farm Credit system, and the relationships established thereunder between the bank and Federation. The bank and Federation are both part of the farm credit scheme established by Congress. To aid in the financing of cooperatives and farmers' cooperative federations, twelve regional and one central bank were created in 1933, capitalized largely by government funds and partly by sale of stock to borrowing cooperatives. In 1955, Congress altered this structure through a plan designed to effect a gradual transfer of ownership from the government to the participating cooperatives.[1] The 1955 amendments [2] authorized three classes of stock in the banks, each with a par value of $100 per share. Class A consists of non-voting, non-dividend shares representing the total pre-1956 government investment; class B is a non-voting, 4% stock replacing the cooperatives' pre-1956 investment; and class C represents the cooperatives' post-1956 investment. Both class B and C stock are issuable only to farmers' cooperative associations, except with approval of the Farm Credit Administration (FCA) and the Directors of the issuing bank. Once *issued,* how-

---

1. The plan is outlined in the Report of the House Committee on Agriculture attached to the Bill which embodied the 1955 amendments:

> "The primary purpose * * * of the bill is to provide a plan under which the banks would be organized on a truly cooperative basis. Borrowing cooperatives would continually make capital contribution to the system so long as they used its credit service. Each year final net savings * * * would be distributed as patronage refunds to borrowing cooperatives in the form of capital, all of which capital would remain in the system until all of the capital stock of the United States had been retired. Each year government capital would be retired in an amount equal to the required stock contributions of and the patronage refunds to the borrowing cooperatives." House Report No. 863 accompanying H.R. 5168.

2. Act of August 11, 1955, amending 12 U.S.C. § 1134d.

ever, class C stock may be *transferred* to "any person" without restriction, as may class B stock with the permission of the original issuing bank.[3]

Each borrower from a bank for co-operatives is required to own at least one share of class C stock. In addition, a borrower must purchase quarterly an amount of class C stock equal to 10 to 25 per cent of the interest paid on loans to the bank during that period.[4] Owners of class C stock are entitled to annual "patronage refunds" out of the bank's net earnings, in the form of additional class C stock.[5]

Each year the bank must retire an amount of class A (government) stock equal in value to the class C stock issued during that year.[6] Thus, if the bank issues $1 million in class C stock in 1966, it must have retired at least $1 million of class A stock by the end of the year. Moreover, no class B or class C stock may be retired until the government's investment in class A stock has been completely redeemed.[7] At the argument of the appeal we were informed that this process of transferring ownership in the banks from the government to the co-operatives, and the complete redemption of the class A stock, is expected to be completed by mid-1967.

After the retirement of all outstanding class A stock, the statute permits the directors of each bank to begin retirement of the oldest outstanding shares of class B and C stock.[8] Under this "first in first out" plan, a revolving fund is created which permits the holder of earlier-issued shares to recoup in cash his initial investment plus any accumulated surplus. Thus, owners of class B and C stock will begin to redeem their shares after the retirement of class A shares has been completed.

When, as in the present case, a bank for cooperatives makes facility loans to a cooperative, it must obtain mortgages on the purchased property.[9] Further protection against default is provided in § 1134d(c) of Title 12, by giving the bank a first lien on all class B and C stock issued to a cooperative, as "additional collateral for any indebtedness of such association to the bank." Although redemption of such stock must normally await retirement of previously-issued shares, the bank's directors are empowered to accelerate retirement or cancellation of stock held by a defaulting borrower, *ibid.*, subject to regulations promulgated by the Farm Credit Administration. These regulations specifically authorize retirement when the borrower has been declared bankrupt or has had a substantial part of its property placed in receivership. 6 C.F.R. § 70.153(a).

## II

As noted above, Federation was indebted to the bank in the amount of approximately $162,000, secured by (a) mortgages on the purchased property as well as (b) the statutory lien on class B and class C stock issued to Federation over the years. After the mortgaged property had been sold the bank filed a proof of secured claim listing as security both the mortgages on the property (or the proceeds of the sale) and the liens on the stock. The trustee's answer acknowledged the debt but asked that the bank be required to set off the value of the stock against its claim. The bank moved to dismiss the answer on the ground that, regardless of the value of the stock in its hands, it could not be required to satisfy its claims out of the stock ahead of the mortgages.

The referee conducted a hearing on this motion. At one point, in response to an inquiry by the referee, counsel for the bank conceded that under the bank's accounting system, the book value of

---

3. See generally 12 U.S.C. §§ 1134d(a) (1)–(3).

4. 12 U.S.C. § 1134d(a) (3).

5. 12 U.S.C. § 1134*l*(a), (b).

6. 12 U.S.C. § 1134d(a) (1).

7. 12 U.S.C. § 1134d(a) (2), (3).

8. Ibid.

9. See 12 U.S.C. § 1134c(a); 12 U.S.C. § 1141e(c) (1); 6 C.F.R. § 70.76.

class B and C stock was considered equal to its par value, but there was no testimony whatsoever regarding the value of the stock in the hands of the trustee or the general creditors of the bankrupt. At the end of the hearing, the referee announced that he was overruling the bank's motion to dismiss the trustee's answer.

Subsequently, without any further hearings on the question of value, the referee .filed written findings of fact and conclusions of law. Treating the proceeding as one under section 57(h) of the Bankruptcy Act for valuation of securities held by a secured creditor, the referee found that in the hands of the bank the stock was worth $113,000, its book value. He further found that

> "[T]he Bank for Cooperatives has control over the purchase and sale of all of its outstanding shares of stock in that it may refuse permission for any person or corporation to purchase said stock; [and] that said stock is not regularly sold on any exchange or over the counter."

The referee therefore ordered the bank to set off the value of the stock against its claim, and ordered Federation to pay the difference between this value ($113,-000) and the amount of the claim ($162,-000).

In affirming the referee's order, the District Court was apparently influenced by an event which occurred after the referee's decision. The Cotton Producers Association of Atlanta offered to purchase the stock for $50,000—45 per cent of its par value and allocated surplus. The District Court observed that "[n]o other offers have been received and none are likely considering the restrictions on transfer and ownership." It concluded that "[i]f the stock involved here were freely transferable or saleable on the open market, there would be no problem, as it could be sold and the proceeds applied to the debts of the federation," but that under the circumstances, if no offset were allowed, the creditors would be substantially damaged.

### III

We agree with the referee that the trustee should be permitted to offset the stock against the bank's claim. The referee, however, ruled that the amount of the offset should be par value plus allocated surplus—a measure with which we do not agree.[10]

10. The District Court, accepting the bank's contention that allowance of an offset would result in a premature forced redemption of the stock, felt that an arbitrary refusal by the bank to exercise its statutory power to accelerate retirement of stock held by a bankrupt borrower constituted an abuse of discretion. The court stated that:

"Under the circumstances of this case, the Bank should not refuse to do what it has authority to do when equity and justice demand it. The Bank did not see fit to disclose to the referee its reason, if any, for refusing to credit the stock against the debt, other than its bare conclusion that other borrowing cooperatives would be injured. This is not what is meant by the exercise of discretion."

In its brief in this court, the bank stated that on a number of occasions the Board of Directors considered retiring the stock but declined to do so. This refusal was based on a belief that

"Widespread premature * * * redemption would result in depletion of Bank's capital and impair the marketability of debentures, thereby curtailing, if not defeating Bank's ability to make loans to farmer cooperative associations. It would encourage liquidation of borrowing associations and would give a preference to those liquidating over other stockholders."

These fears seem to us exaggerated in light of the continuing demand for farm credit loans. The suggestion is too fanciful for serious consideration that either redemption or offset would "encourage liquidation" and that cooperatives would embark upon the suicidal course of voluntary bankruptcy in order to recapture their capital investments in the bank. However this may be, we need not substitute our judgment for that of the Board of Directors as to retirement of stock, since we do not order retirement. Nor do we consider offset equivalent to redemption since the bank can reissue the stock at par to other borrowing cooperatives.

■ Section 57(h) of the Bankruptcy Act establishes a valuation procedure whereby a secured creditor's claim is offset by the value of securities held by him.[11] The bank contends preliminarily that the stock was "held" by the trustee, not the secured creditor, and valuation proceedings were therefore inappropriate. This is a strained reading of the Act. Normally, of course, a secured creditor will have physical possession of the securities since, if they are negotiable, transfer to a bona fide purchaser may cut off his rights. We think, however, that use of the word "held" in section 57(h) was not meant to restrict its applicability to cases where the secured creditor has physical possession of the securities. Rather it appears only to reflect what the draftsmen contemplated as the usual situation. Here the stock is "held" by the bank as security within the design of the Act which gives the bank a lien on the stock, and physical possession of the certificate is of no consequence. There is no contest here over possession and the bank can readily obtain surrender of the certificate. Indeed the trustee is tendering it and the bank need only accept it. The purpose of section 57(h) is to expedite settlement of the bankrupt's estate and, to this end, the section directs valuation and offset of securities which, upon bankruptcy, are equitably owned by the secured creditors. Where, as here, no question arises of competing equities between the secured creditor and subsequent transferees or other claimants, we hold that section 57(h) is satisfied by a showing that the creditor's lien attaches to specifically identified securities.

The bank vigorously argues that section 1134d(c) of Title 12 makes stock owned by Federation "additional" securi-

ty for the debt and being "additional" it may be applied against the debt only after the specific collateral has been exhausted. There is a superficial plausibility to this semantic reasoning but on closer examination we find it unpersuasive. The word "additional" is not so crystal clear that one has no need to look further. The legislative purpose as revealed by the entire context must be considered. Calling the stock additional does not necessarily mean that it is secondary. The stock may well have been denominated "additional" only because specific security for a commodity or facility loan, though not for an operating capital loan, is required.[12] This characterization, however, does not imperatively fix the order that the bank is bound to follow in satisfying the debt due it. The answer to that question must be sought in the wider perspective afforded by the equitable principles that infuse the administration of the bankruptcy courts.

■ Application of these principles, particularly the doctrine of marshalling of assets, clearly supports an offset. An apt definition of marshalling was framed by Justice Stone: "The equitable doctrine of marshalling rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." Sowell v. Federal Reserve Bank, 268 U.S. 449, 457, 45 S.Ct. 528, 530, 69 L.Ed. 1041 (1925). See Meyer v. United States, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963) (marshalling denied where one fund exempt from creditors' claims under state law); Merchants' & Mechanics' Bank v. Sewell, 61 F.2d 814 (5th Cir. 1932). In our circuit marshalling has been employ-

11. § 57(h) of the Act is codified as 11 U.S.C. § 93(h) (1958), and reads as follows:

"The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors, or by such creditors and the trustee by agreement, arbitration, compromise or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance. Such determination shall be under the supervision and control of the court."

12. 6 C.F.R. §§ 70.50, 70.61, 70.76 (1966).

ed to prevent a gratuitous sacrifice of one creditor's interests when all interests can be fully protected. See Textile Banking Co. v. Widener, 265 F.2d 446 (4th Cir. 1959). In the instant case, the bank's claim is secured by both the mortgages and deeds of trust and the lien on the stock. Satisfaction out of the former would result in a forced sale of the stock at 45 per cent of its par value, while an offset would preserve the value of the stock and fully satisfy the indebtedness without injury to the bank's other shareholders. Under these circumstances marshalling is in order. After full consideration, we think it too far-fetched an assumption that the word "additional" was meant to set aside this deeply rooted doctrine.

We do not overlook the bank's argument emphasizing the importance of preserving the normal chronology of redemption. The offset does not dislocate the plan for we find nothing in the Farm Credit Act which prevents reissuance of the stock to other borrowing cooperatives. Thus, other shareholders, who will be entitled to redemption of their stock before or at the same time as Federation's, are not disadvantaged. Were offset denied, the alternatives open to the trustee would work unnecessary hardship on Federation's general creditors. True, the trustee might retain the stock until its retirement date and then redeem it at par plus allocated surplus. Retirement of class B and class C stock, however, is several years in the future. These shares can be retired in the order of their issuance only after all outstanding class A stock is retired, which, according to the record, will not occur until mid-1967. The record does not disclose when the stock was issued to Federation, nor is it known when all presently outstanding class B and class C stock will be redeemed. Since, therefore, redemption of the trustee's stock may be some years away, holding the stock and delaying the closing of the estate is not a practical alternative. The remaining alternative is for the trustee to sell the stock now and recover what he can. This too is undesirable since only one offer, for 45 per cent of the par value, has been received and, as the District Court noted, others are unlikely. However thin the general market for these shares may be, the continuing stream of borrowers from the bank provides it with a ready market. No practical damage to the bank is to be apprehended from the offset.

However, we agree with the bank that the stock may not be offset at par without a valuation. Stock, as we all know, may have a value above or below its par. Section 57(h) provides that value may be determined by converting the securities into money, or by agreement, arbitration, compromise or litigation.[13] The bank contends that the hearing before the referee was insufficient "litigation" because no evidence was introduced or testimony taken and the referee relied solely upon a statement by counsel for the bank that the *book* value was not less than par. While the bank's attorney stated in answer to an inquiry from the bench that he did not seriously contest that the stock was worth "at least par," at another point he stressed the inadequacy of the hearing to establish value. To resolve the ambiguity and to give the parties a full and fair opportunity to establish the actual value of the stock, we vacate the order and remand with instructions to the District Court to order a hearing or conduct other appropriate proceedings under section 57(h).

*Order vacated and case remanded.*

### MEMORANDUM ORDER

The bank petitions for a rehearing and modification of our decision of October 4, 1966, in which we directed that the value of the bank's stock held by Federation be offset against Federation's debt to the bank. We remanded the case to the District Court for valuation proceedings under section 57(h) of the Bankruptcy Act.

---

13. While retirement of the stock would be at its "fair book value not exceeding par," 6 C.F.R. § 70.153 (1966), the procedure under § 57(h) contemplates offset of the actual value of the securities to be determined in the prescribed manner.

The petitioner contends that in stating, "[o]wners of class C stock are entitled to annual 'patronage refunds' out of the bank's net earnings * * *," we erroneously overlooked the provision of the statute that such refunds are to be distributed "in the proportion that the amount of interest earned on the loans of each borrower bears to the total interest earned on the loans of all borrowers during the fiscal year." The bank argues that as a result of the alleged oversight the valuation which we ordered will be unduly inflated. We do not agree that our language implies what the bank reads into it. Nevertheless, to avoid any possibility of misunderstanding we now add to footnote 5 the following explicit statement:

> It is to be noted that patronage refunds are to be paid "in the proportion that the amount of interest earned on the loans of each borrower bears to the total interest earned on the loans of all borrowers during the fiscal year."

We are not persuaded that the offer of the Cotton Producers Association of 45% of the par value of the stock was reasonable and reflected the true value of the stock, and adhere to our view that a hearing should be held to determine true value.

 In support of its petition the bank also argues that we were in error in stating that no practical damage to it is to be apprehended from the offset. The petition asserts that on resale of the stock the bank will be required to retire government owned class A stock of equal value, and that to this extent the bank will be decapitalized. We find nothing in the Act, however, that requires the bank to retire additional class A stock upon *resale*, as distinguished from initial *issuance*, of class C stock. True, Congress, in the 1955 Amendments, set up a plan designed to effect a transfer of the bank's ownership to the participating cooperatives through a gradual retirement of the government's stock investment. But there is no indication that Congress was in such a hurry to accomplish this result that it required the retirement of class A stock upon *resale* of shares of C stock in respect to which a retirement of class A stock has already taken place. Retirement of class A government stock upon the original issuance of the C stock is sufficient to satisfy the Act. Alternatively, the bank may, at its option, merely retain the stock and await its normal retirement date to recoup the par value. While this delay might be said to involve a slight detriment, it is preferable to the course urged by the bank, requiring a forced sale of the stock at a figure which a hearing may show to be a fraction of its real value.

For these reasons, the petition for rehearing is denied and the original opinion, expanded as above indicated with respect to patronage refunds, stands.