In re Durwood Rufus **MASSENGILL,**
SS#: 240–60–5277, Laura Faye Massengill, SS#: 244–70–8036, Debtors.

**Bankruptcy No. 86–02736–SO5.**

United States Bankruptcy Court,
E.D. North Carolina.

June 5, 1987.

John W. Morris, Smithfield, N.C., for
debtors.

Mark C. Kirby, Raleigh, N.C., for FLB
and PCA.

Richard M. Stearns, Kinston, N.C., trustee.

Rudolf A. Renfer, Jr., Asst. U.S. Atty.,
E.D.N.C., Raleigh, N.C.

1. The 90–day time limit for filing the chapter 12
   plan was extended to March 24, 1987, after Mr.

## MEMORANDUM OPINION

A. THOMAS SMALL, Bankruptcy Judge.

The matter before the court is the confirmation of the debtors' amended chapter 12
plan. The Federal Land Bank of Columbia
("Land Bank") and South Atlantic Production Credit Association ("PCA") filed a joint
objection to confirmation on April 27, 1987.
A hearing was held in Raleigh, North Carolina, on April 29, 1987.

The parties have settled all issues except
whether the debtors may, as part of their
plan, surrender Land Bank and PCA stock
upon confirmation to the Land Bank and
PCA in satisfaction of an equivalent
amount of debt owed by the debtors. All
of the confirmation requirements have
been met, and the only unresolved matter
is the fate of the Land Bank and PCA
stock.

### FACTS

Durwood Rufus Massengill and Laura
Faye Massengill of Four Oaks, North Carolina, have been in the business of farming
tobacco, corn, soybeans, and other crops
for over twenty-five years. Mrs. Massengill has supplemented the family income
with jobs in the Johnston County Sheriff's
Department and at North Carolina State
University.

Mr. and Mrs. Massengill filed a joint
petition under chapter 12 of the Bankruptcy Code on November 26, 1986. The debtors' chapter 12 plan was filed on March 24,
1987, was amended on April 20, 1987, and
was orally amended at the confirmation
hearing.[1]

Essentially, the plan allows the debtors
to keep their residence, but provides for
the liquidation of their farmland and farm
equipment. The debtors will continue
farming by leasing land and borrowing
equipment. Portions of the Land Bank and
PCA secured claims will be paid in annual
installments and all of the debtors' disposable income is to be paid to holders of unsecured claims for three years.

Massengill suffered a heart attack in February,
1987. 11 U.S.C. § 1221.

The Land Bank is the holder of a secured claim in the amount of approximately $88,-000 which is secured by three tracts of real property, including the debtors' residence, and by Land Bank stock with a par value of $5,000. The debtors, the Land Bank, and the chapter 12 trustee have stipulated that the value of the collateral exceeds the amount of Land Bank's lien. Farmers Home Administration has a second lien on the same three tracts, and has agreed to accept the plan and the treatment provided for its secured claim.[2]

PCA is the holder of a secured claim in the amount of approximately $6,500 which is secured by bulk barns, miscellaneous farm equipment, and PCA stock with a par value of $925. The debtors, PCA, and the chapter 12 trustee have stipulated that the value of the collateral equals or exceeds the amount of the indebtedness.

The debtors' plan proposes to satisfy the $88,000 secured claim held by the Land Bank by selling two of the three tracts for approximately $29,000 and paying the proceeds to the Land Bank, by transferring the Land Bank stock to the Land Bank upon confirmation for a credit of $5,000, and by paying the balance of the claim secured by the third tract, the debtors' residence, over a period of twenty years in annual installments which include interest at the Land Bank's prevailing variable interest rate.

The PCA secured claim of $6,500 is to be satisfied by selling equipment and paying the proceeds to PCA, by transferring the PCA stock to PCA upon confirmation for a credit of $925, and by paying the balance of the claim secured by the bulk barns over a period of four years in annual payments which include interest at PCA's prevailing variable interest rate.

Both the Land Bank and PCA accept the treatment provided by the debtors' chapter 12 plan with the exception of the provisions requiring the Land Bank and PCA to reduce their secured claims by the amount of the stock which the debtors are attempting to return.

## DISCUSSION AND CONCLUSIONS

The debtors propose to surrender to the Land Bank and PCA the Land Bank and PCA stock, which secures the Land Bank and PCA secured claims respectively, pursuant to 11 U.S.C. §§ 1222(b)(8) and 1225(a)(5)(C). The Land Bank and PCA contend that the Farm Credit Act of 1971 prohibits the Land Bank and PCA from being compelled to retire their stock and further contend that the stock should not be redeemed until their claims are paid in full.

The Farm Credit Act of 1971 (12 U.S.C. § 2001, *et seq.*) governs the operation of both Federal land bank associations and production credit associations. 12 U.S.C. § 2002. Borrowers from a federal land bank association are required to become stockholders in the land bank association (12 U.S.C. § 2016 and § 2034(a))[3] and pro-

---

**2.** FmHA's secured claim is secured by the second lien on the residence and by liens with different priorities on farm equipment. The portion of FmHA's secured claim which is secured by the second lien on the residence is approximately $11,000 and will be paid over 20 years at 9.5% interest. In arriving at the approximate value of $11,000 for the second lien, the parties in effect reduced Land Bank's first lien on the residence by the $5,000 par value of the stock.

**3.** 12 U.S.C. § 2016, titled "Eligibility", states:
The services authorized in this subchapter [Federal Land Banks and Associations] may be made available to persons who are or become stockholders or members in the Federal land bank associations and are (1) bona fide farmers, ranchers, or producers or harvesters of aquatic products, (2) persons furnishing to farmers and ranchers farm-related services directly related to their on-farm operating needs, or (3) owners of rural homes.
12 U.S.C. § 2034(a) states in pertinent part:
The shares of stock in each Federal land bank association shall have a par value of $5 each. No person but borrowers from the bank shall become members and stockholders of the association. If an application for membership is approved and if the applied-for loan is granted, the member of the association shall subscribe to stock in the association in an amount not less than 5 per centum nor more than 10 per centum of the face amount of the loan as determined by the bank. Stock shall be paid for in cash by the time the loan is closed. The association shall then purchase a similar amount of stock in the land bank.

duction credit association borrowers must purchase production credit association stock (12 U.S.C. § 2094).[4] Only active borrowers from the Land Bank or PCA may own such stock (12 U.S.C. §§ 2034(a) and 2094(b)) and both the Land Bank and PCA are granted first liens on all stock issued by them for payments of any liability owed to them by the stockholders (12 U.S.C. §§ 2054 and 2094(j)).

The Land Bank and PCA maintain that the Farm Credit Act vests the right to retire or cancel Land Bank or PCA stock *solely* in the discretion of the Land Bank or PCA and that that discretion cannot be displaced by provisions of the Bankruptcy Code.

The Farm Credit Act (12 U.S.C. § 2034(a)) provides that if a land bank association loan is in default, the land bank association stock *"may* be cancelled for application on the loan ... when approved by the [district land] bank" (emphasis added). Similarly, 12 U.S.C. § 2094(k) gives PCA the right to cancel its stock and credit the loan upon default by its borrower. Furthermore, the regulations governing Farm Credit institutions state that "the bank may, *but shall not be required to,* retire and cancel all or part of any stock ... on which the bank has a lien as collateral for the debt ..." 12 C.F.R. § 615.-5260(b) (emphasis added).

One bankruptcy court has held that the right to cancel production credit association stock upon default is discretionary with the production credit association and that this right cannot be overridden by the Bankruptcy Code. *In re Walker*, 48 B.R. 668 (Bankr.D.S.D.1985). In the *Walker* case, chapter 11 debtors sought to retire their production credit association stock and thereby reduce their indebtedness as part of their chapter 11 plan. In holding that a

debtor may not retire or cancel production credit association stock as a part of a chapter 11 plan, the court stated:

> To permit debtors in Chapter 11 reorganization to cancel their B Stock would do more than impair the P.C.A.'s claims in these two cases; it would alter the capital structure of the P.C.A. and would seriously undermine the functioning of the whole farm credit system as envisioned by Congress under the Farm Credit Act.

48 B.R. at 670.

The Fourth Circuit Court of Appeals, however, in a case of first impression involving the relation of the Farm Credit Act to bankruptcy proceedings under the Bankruptcy Act of 1898, held that the Farm Credit Act did not preclude the bankruptcy trustee from offsetting stock of a bank for cooperatives against the bank for cooperative's claim. *Columbia Bank for Cooperatives v. Lee*, 368 F.2d 934 (4th Cir.1966), *cert. denied*, 386 U.S. 992, 87 S.Ct. 1808, 18 L.Ed.2d 338 (1967). In the *Columbia Bank for Cooperatives v. Lee* case, a farming cooperative which had filed for bankruptcy owed the Columbia Bank for Cooperatives approximately $162,000 which was secured by mortgages on property of the bankrupt and by statutory liens on stock issued to the bankrupt by the Columbia Bank for Cooperatives. The stock had been issued pursuant to provisions of the Farm Credit Act similar to those involved in this case and the bankrupt had been required by the Farm Credit Act to purchase the stock in order to obtain its loan. 12 U.S.C. § 1134d(c) authorized the Columbia Bank to retire and cancel the stock upon the borrower's default. (The wording of § 1134d(c) is similar to the statutory language at issue here.[5]) The bankruptcy

---

**4.** 12 U.S.C. § 2094(f) states in pertinent part:
 Each borrower from the [production credit] association shall be required to own at the time the loan is made voting stock or participation certificates as provided in the bylaws of the association, in an amount equal in book value (not exceeding par or face amount, as the case may be), as determined by the association, to $5 per $100 or fraction thereof of the amount of the loan. Such stock

and participation certificates shall not be canceled or retired upon payment of the loan or otherwise except as may be provided in the bylaws.

**5.** The applicable statute, 12 U.S.C. § 1134d(c), stated in pertinent part:
 In any case where the debt of a borrower is in default, the bank may, in accordance with regulations of the Farm Credit Administra-

trustee sought to transfer the stock back to Columbia Bank and setoff its value against Columbia Bank's claim. The bank objected on the grounds that it could not be required to satisfy its claims out of the stock instead of through its mortgages on the bankrupt's property.

Despite the language of 12 U.S.C. § 1134d(c) stating that the bank "may" (as opposed to "shall") retire and cancel a borrower's stock upon default, the Fourth Circuit permitted the trustee to surrender the stock and offset its value against the bank's claim.[6] The court first noted that the district court had upheld the trustee's right to have the value of the stock credited against the bank's claim by finding that the bank had abused its discretionary authority under § 1134d(c) by not retiring the stock. The bank had argued on appeal that there was no abuse of discretion because allowing a "premature forced redemption" would lead to a serious depletion of the bank's capital and would impair the bank's ability to make other loans to farmer cooperative associations. The Fourth Circuit rejected this argument and then went on to hold that 12 U.S.C. § 1134d(c) was irrelevant in any event because the setoff was

not a retirement of stock within the meaning of § 1134:

> The suggestion is too fanciful for serious consideration that either redemption or offset would "encourage liquidation" and that cooperatives would embark upon the suicidal course of voluntary bankruptcy in order to recapture their capital investments in the bank. However this may be, we need not substitute our judgment for that of the Board of Directors [of the bank] as to retirement of stock, since we do not order retirement. Nor do we consider offset equivalent to redemption since the bank can reissue the stock at par to other borrowing cooperatives.

368 F.2d at 938 n. 10.[7]

The Fourth Circuit went on to hold that an offset was particularly appropriate because allowing the bank to satisfy its claims from its mortgages, rather than from its lien on the stock, would work to the detriment of other creditors because there would be less funds available from which to satisfy their claims. Similar considerations prevail in the present case because, if the debtors are permitted to reduce the secured claims by the value of the stock, less interest will be paid and disposable income will be increased by the amount of the interest that is saved.[8]

---

tion, retire and cancel all or part of the stock of the defaulting borrower at the fair book value thereof, not exceeding par, in total or partial liquidation of the debt, as the case may be, and, to the extent required, corresponding shares held by a regional bank in the central bank shall be retired.

**6.** The court relied on § 57(h) of the Bankruptcy Act codified as 11 U.S.C. § 93(h) (1958), *repealed* by the Bankruptcy Reform Act of 1978, which reads as follows:

The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors, or by such creditors and the trustee by agreement, arbitration, compromise or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance. Such determination shall be under the supervision and control of the court.

In the district court, the bankrupt conceded that the "setoff" was not a true setoff because there was no "mutual debt." *Matter of Farmers Feder-*

*ation Cooperative, Inc.,* 243 F.Supp. 650, 651–652 (W.D.N.C.1965). The issue of setoff under 11 U.S.C. § 553 and state "setoff" law is not considered in the present case as no evidence was introduced to show that the stock was in reality a mutual debt. In a prior opinion, Chief Judge Thomas M. Moore of this court found that in a similar case no stock had been issued and the "stock" was in effect merely a deposit. *In re Johnson,* No. 81–02856–5(A) (Bankr.E.D.N.C., May 27, 1982).

**7.** It is doubtful that family farmers will rush to chapter 12 so that they can prematurely redeem their land bank and production credit association stock, and this court is not convinced that the capital structure of the Land Bank or PCA will be seriously undermined if farmers in chapter 12 or chapter 11 are permitted to surrender their Land Bank or PCA stock for a credit against secured claims.

**8.** FmHA has accepted the treatment of its secured claim as provided by the plan and the value of the Land Bank stock was a factor in determining the amount of FmHA's secured claim. Whether the debtors are permitted to surrender their stock at the beginning of their

Chapter 12 debtors, like chapter 13 debtors, should be encouraged to surrender unnecessary non-income producing property which is collateral for secured claims where the effect of keeping the property would be to decrease disposable income available for holders of unsecured claims. *In re Festner*, 54 B.R. 532 (Bankr.E.D.N.C.1985) (chapter 13) and *In re Kitson*, 65 B.R. 615 (Bankr.E.D.N.C.1986) (chapter 13).

It is indeed true that the redemption limitations imposed on the stock of land banks and production credit associations were designed to promote stable membership of these organizations and to enhance their capital structure. *In re Walker*, 48 B.R. 668 (Bankr.D.S.D.1985); *In re Cooperativa Cafeteros de Puerto Rico*, 19 B.R. 732 (Bankr.D.P.R.1982); *United States v. Mississippi Chemical Corp.*, 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972). It is also true that 11 U.S.C. §§ 1222(b)(8) and 1225(a)(5)(C) which authorize a return of the stock contravene that policy, but here, as in *Columbia Bank for Cooperatives v. Lee*, the bankruptcy law controls. It is not uncommon that the Bankruptcy Code will prevail over a conflicting federal law. For example, the Supreme Court has held that a chapter 11 debtor's right to unilaterally reject a collective bargaining agreement is paramount to provisions of the National Labor Relations Act which would prohibit that action.[9] *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In the *Bildisco* case the Supreme Court said:

> Consequently, Board enforcement of a claimed violation of § 8d [of the National Labor Relations Act] under these circumstances would run directly counter to the express provisions of the Bankruptcy Code and to the Code's overall effort to give a debtor-in-possession some flexibility and breathing space.

104 S.Ct. at 1199.

Chapter 12 is "designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and to keep their land." H.R.Rep. No. 99–958, 99th Cong., 2d Sess. 48 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5227, 5249. It is emergency legislation which suspends a number of creditor protections which are available in chapter 11 [10] to facilitate family farmer reorganization. The essence of chapter 12 reorganization is the debtor's ability to deal with secured claims. In that regard, the debtor has great flexibility and many options. One method is found in 11 U.S.C. § 1222(b)(8) which states that a chapter 12 plan may "provide for the sale of all or any part of the property of the estate *or the distribution of all or any part of the property of the estate among those having an interest* in such property" (emphasis added).[11] Furthermore, surrender of property securing a claim to the holder of the secured claim is specifically recognized in the chapter 12 confirmation requirements of 11 U.S.C. § 1225(a)(5)(C) [12] as a proper way to treat a secured claim. A debtor's ability to return land bank or production credit association stock to land banks and production credit associations to satisfy or reduce secured claims should not be frustrated by the Farm Credit Act of 1971.

---

plan or required to wait until the end to do so should not affect the amount of FmHA's second lien on the real property for purposes of the plan. Consequently, any increase in disposable income resulting from reduced interest payments on the Land Bank and PCA secured claims will be made available to holders of unsecured claims.

**9.** 29 U.S.C. §§ 158(a)(5) and 158(a)(1).

**10.** In chapter 12 there is no voting, no "absolute priority rule," no adequate protection of "lost opportunity costs," no time limit on repayment of secured claims, no § 1111(b) election, and no

§ 363(f) requirements that must be met in order to sell farm land or farm equipment free of liens.

**11.** The language of 11 U.S.C. § 1222(b)(8) is taken from chapter 11—11 U.S.C. § 1123(a)(5)(D).

**12.** The language of 11 U.S.C. § 1225(a)(5)(C) is taken from chapter 13—11 U.S.C. § 1325(a)(5)(C). Surrender of collateral to the holder of a secured claim for a credit against the claim is permitted in chapter 11 as well. *In re Fursman Ranch*, 38 B.R. 907 (Bankr.W.D.Mo. 1984).

Having determined that the debtors may surrender the Land Bank and PCA stock, the court must determine the amount which is to be credited against the secured claims. Very little attention was given to this issue at the confirmation hearing and it was generally agreed that the value of the stock was the par value—$5,000 in the case of the Land Bank and $925 for the PCA stock. In *Columbia Bank for Cooperatives v. Lee*, the Fourth Circuit Court of Appeals remanded the case to the District Court to determine the value of the stock which was being returned. The cooperative bank stock involved in that case was substantially different than the stock involved in the present case. In the *Columbia Bank for Cooperatives v. Lee* case the stock's value was not limited to the amount of the original loan it secured. In the present case, however, the stock is to be retired at book value not to exceed par or the face amount. 12 U.S.C. § 2034(a);[13] 12 U.S.C. § 2094(k).[14] There has been no suggestion that the book value of the two stocks is worth less than their par or face value, $5,000 and $925.

An argument could be made that a discount factor should be applied to the value of the stock because typically the stock is not redeemed until the loan is paid in full. Such an argument, however, would not be convincing because both the Land Bank and PCA have the right in their discretion to immediately redeem the stock. But, whether or not the stock is in fact redeemed is not important for purposes of determining the amount by which the secured claim of the Land Bank and PCA should be reduced. What is important is that Land Bank and PCA have the right in their discretion to redeem the stock, and if they elect not to exercise that right then they, not the debtors, should bear any eco-

nomic loss which arises from that decision. The Land Bank and PCA secured claims will be reduced by the face amount of the stock to be surrendered—$5,000 for the Land Bank stock and $925 for the PCA stock.

A separate order confirming the debtors' chapter 12 plan will be entered consistent with this memorandum opinion.

---

**13.** The relevant portion of 12 U.S.C. § 2034(a) reads as follows:

    Stock shall be retired and paid at book value not to exceed par, as determined by the [Federal land bank] association, upon the full repayment of the loan and if the loan is in default may be canceled for application on the loan, or under other circumstances, for other disposition, when approved by the bank.

**14.** 12 U.S.C. § 2094(k) states:

    In any case where the debt of a borrower is in default, the [production credit] association may retire all or part of the capital investments in the association held by such debtor at the book value thereof, not exceeding par or face amount, as the case may be, in total or partial liquidation of the debt, on written notice to the borrower and approval by the bank of such retirement.