**In re Carol and Boyd SHANNON, Debtors–Appellants.**

**No. C–2–87–1295.**

United States District Court, S.D. Ohio, E.D.

May 18, 1989.

---

914

Charles W. Ewing, Columbus, Ohio, for debtors-appellants.

William B. Logan, Jr., Luper, Wolinetz, Sheriff & Niedenthal, Columbus, Ohio, for appellee.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the appeal of Carol and Boyd Shannon from an order of the United States Bankruptcy Court for the Southern District of Ohio. District courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges. 28 U.S.C. § 158(a) (Supp. IV 1986); Bankr.R. 8001.

This appeal requires the court to consider the impact of Chapter 12 [1] of the Bankruptcy Code on the Farm Credit Act of 1971 [2] and the Agricultural Credit Act of 1987. [3] The plight of family farmers merits the attention of lawmakers and Chapter 12 is an effort to afford them some relief after the hard economic times of the past years. Decreasing market prices, increasing costs of production, and natural disasters have combined to place our Nation's farmers in dire straits. It is with the desperate quandary of the family farmers in mind that this Court now considers the appeal of the debtors.

Boyd and Carol Shannon ("the debtors") purchased the Bower family homestead in November, 1975. The Shannons advanced a downpayment of $50,000 and borrowed the balance of the purchase price ($207,000) from the Federal Land Bank of Louisville ("the Land Bank") at a 9% interest rate. They successfully raised hogs and planted grain and soybeans on their 223-acre tract.

In 1979, however, the Shannons suffered flood damage from hurricane Frederick. In 1981, they faced significant crop losses from excessive rain in the Spring and a

---

1. 11 U.S.C. §§ 1201–1231 (Supp. IV 1986). Congress enacted the provisions of Chapter 12 in the Bankruptcy Judges, United States Trustees, and Family Farmer Act of 1986. Pub.L. No. 99–554, 100 Stat. 3088.

2. Pub.L. No. 92–181, 85 Stat. 583 (recodified 1988).

3. Pub.L. No. 100–233, 101 Stat. 1568 (1988).

drought during the Summer. Perhaps due to these hardships, the Shannons reamortized their mortgage on March 1, 1982. The new agreement provided for a 12.75% interest rate. They sustained even harsher drought conditions in 1983.

Despite the respite of reamortization, the Shannons filed for bankruptcy under Chapter 12 on April 16, 1987. They submitted a Chapter 12 plan on July 29, 1987, to which the Land Bank objected. After two additional amended plans, the court below issued an order confirming the debtors' "Third Amended Chapter 12 Plan" ("the Plan") on September 21, 1987. The court confirmed the Plan subject to two crucial conditions, the subject of this appeal which the debtors filed on October 1, 1987.

First, the Plan would be confirmed only if the debtors retained possession of the stock in the Land Bank which they were required to purchase at the time they initiated their loan. The Plan had provided for the debtors to surrender the stock to the Land Bank and for a setoff of the $10,000 value of the stock from the amount of the Land Bank's allowed secured claim.[4] The first issue on appeal, then, is whether the bankruptcy court erred in requiring the Shannons to retain this stock.

Second, the Plan would be confirmed only if the debtors agreed to repay the Land Bank's allowed secured claim in a stream of payments subject to a variable discount rate, in effect an interest rate, of 12.5%.[5] The debtors now claim on appeal that this rate is excessive. As a matter of law, they claim that the proper procedure for determining a discount rate is to derive a rate based on the Land Bank's cost of funds or, in the alternative, basing a rate on that for 52–week United States Treasury obligations. As a factual matter, they contend that such a rate would, in fact, be 10.3%. The second issue on appeal, then, is whether the bankruptcy court erred in establishing a discount rate of 12.5%.

## I. THE RETENTION OF FEDERAL LAND BANK STOCK

The Farm Credit Act of 1971 established a system of federal lending institutions for the purpose of financing the purchase and operation of farms.[6] The Agricultural Credit Act of 1987 recodified the Farm Credit Act and established a new statutory scheme governing the extension of credit and organizing the structure of institutions to carry out this task. The Farm Credit Act regulated the creation of Federal Land Banks, now called Farm Credit Banks un-

**4.** The Shannons may be anxious to retire the stock because they would prefer an immediate setoff of $10,000 to a payment of the same amount when the Land Bank repurchases the stock after repayment of the loan. They wish to avoid what is, in effect, interest that they would have to pay on $10,000 of indebtedness which they might otherwise set off. *See* 11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986). Moreover, the stock does not appreciate beyond par value. 12 U.S.C. § 2034(a) (1982) (omitted 1988); 12 U.S.C.A. § 2162(a) (West Supp.1989); and dividends, 12 U.S.C.A. § 2154a(c)(1)(A) (West Supp. 1989), are uncertain.

The Land Bank, by contrast, resists compulsory retirement because stock ownership is crucial in the capitalization of land banks, now called Farm Credit Banks. *See infra* note 6; text accompanying notes 6–7. Moreover, the Land Bank supplements the security underlying the loan principal by taking a first lien on this stock. 12 U.S.C. § 2054 (1982 & Supp. IV 1986) (recodified at 12 U.S.C.A. §§ 2022, 2097 (West Supp.1989)).

**5.** The exact language establishing these conditions provides:

The claim of Federal Land Bank shall include Federal Land Bank's stock and shall be paid over 30 years. Interest shall accrue on the allowed secured claim of the Federal Land Bank at the rate of 12.5% per annum for three (3) years, which rate shall fluctuate according to the c rate classification of the Individual Loan Pricing Program then in effect. *In re Shannon,* No. 2–87–01597 (Bankr.S.D.Ohio Oct. 15, 1987) (order clarifying provision of the court's September 21, 1987 order confirming the Plan).

The Individual Loan Pricing Program is the Land Bank's internal schedule of interest rates, applicable when the Land Bank issues a new loan, based on its short-term outstanding agricultural bonds. *In re Neff,* 89 B.R. 672, 678 (Bankr.S.D.Ohio 1988), *modified on other grounds,* 96 B.R. 800 (Bankr.S.D.Ohio 1989); Stipulated Exhibit A at 54–55 (Testimony of Alan Singleton).

**6.** For a general discussion of the purpose and structure of Farm Credit System institutions, see H.R.Rep. No. 1287, 96th Cong., 2d Sess. 15–17 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 7095, 7098–7100.

der the new law.[7] These banks have three sources of funds to lend to farmers: the sale of bonds, the generation of retained earnings, and the sale of stock to borrowers.

The sale of stock is a crucial aspect of the private financing of the Farm Credit System institutions. "[T]he design of a capital structure utilizing borrower capitalization and participation was intended to remedy the problems inherent in the agricultural lending practices of commercial institutions." *In re Walker*, 48 B.R. 668, 669 (Bankr.D.S.D.1985). The requirement that borrowers purchase and retain stock prevented crises stemming from undercapitalization seen under previous statutory schemes. Accordingly, "[m]uch of the success of the farm credit system has resulted from long-term direct borrower participation." *Id.* at 669–70.

## A. *Textual Analysis*

To determine the merits of this issue, the Court must turn first to the language of the relevant statutes.[8] The Shannons purchased their farm in November, 1975 and granted a mortgage to the Federal Land Bank of Louisville. As a condition to borrowing the purchase price of the farm, the Farm Credit Act required the Shannons to purchase stock in a Federal land bank association in "an amount not less than 5 per centum ... of the face amount of the loan as determined by the bank." 12 U.S.C. § 2034(a) (1982) (omitted 1988).[9]

Under the Agricultural Credit Act, when a lending institution grants a new loan to a borrower, he or she must then purchase stock in the institution in the amount of at least 2% of the face amount of the loan or $1,000, whichever is less. 12 U.S.C.A. § 2021(c) (West Supp.1989) (loans directly through Farm Credit Banks require stock participation in accordance with bank bylaws); 12 U.S.C.A. § 2094 (West Supp. 1989) (stock participation relating to loans through land bank associations governed by association bylaws); 12 U.S.C.A. § 2154a(c)(1)(E)(i) (West Supp.1989)[10] (bylaws must provide for a minimum of 2% or $1,000 stock participation, whichever is less).

The provision governing the retirement of stock provides that the lending institution has the right to cancel a borrower's stock, but the borrower has no such right. It states that lending institution bylaws "shall permit the retirement of stock *at the discretion of the institution* if the institu-

---

**7.** The Agricultural Credit Act mandated the merger of District Federal Intermediate Credit Banks and Federal Land Banks to form Farm Credit Banks. 12 U.S.C.A. § 2011(a) (West Supp.1989); Agricultural Credit Act § 410.

**8.** "[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

**9.** The first segment of this section had provided:

The share of stock in each Federal land bank association shall have a par value of $5 each. No person but borrowers from the bank shall become members and stockholders of the association. If an application for membership is approved and if the applied-for loan is granted, the member of the association shall subscribe to stock in the association in an amount not less than 5 per centum nor more than 10 per centum of the face amount of the loan as determined by the bank. Stock shall be paid for in cash by the time the loan is closed. The association shall then purchase a similar amount of stock in the land bank.

*Id.* The statute, then, requires the borrower to purchase stock in the land bank association administering the loan. The association would in turn purchase a like amount of stock from the Land Bank. Generally, a land bank will not lend money directly to a borrower unless no active land bank association is serving the local area. H.R.Rep. No. 593, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.Code Cong. & Admin.News 2091, 2106.

Given this statutory procedure, the so-called "Land Bank stock" in this case may, in reality, be stock in the land bank association administering the Shannons' loan, the Federal Land Bank Association of Columbus. The record, however, is not clear on this point, and for simplicity's sake, the Court will refer to the stock simply as "Land Bank stock."

**10.** Section 2154a(c)(1)(E)(i) provides that:

as a condition of borrowing from or through the institution, any borrower who is entitled to hold voting stock or participation certificates shall, at the time the loan is made, acquire voting stock or participation certificates in an amount not less than $1,000 or 2 percent of the amount of the loan, whichever is less.

tion meets the capital adequacy standards issued under section 2154(a) of this title." 12 U.S.C.A. § 2154(c)(1)(I) (West Supp. 1989) (emphasis added); 12 C.F.R. § 615.5255(a) (1988).[11] Under old law, land banks had the same exclusive right.[12] Thus, the Land Bank claims that the farm credit statutes do not permit the bankruptcy court to order it to retire the stock pursuant to a Chapter 12 plan.

The debtors argue, however, that Chapter 12 alters the result reached under the farm credit laws. Specifically, Chapter 12 permits bankruptcy courts to confirm plans which provide for the surrender of land bank stock and a set off of the stock's value against the allowed secured claim. To counter the thrust of the apparent statutory support for the Land Bank's position, the debtors interpose three provisions of the Bankruptcy Code.

First, a Chapter 12 plan may "modify the rights of holders of secured claims." 11 U.S.C. § 1222(b)(2) (Supp. IV 1986). Second, the Shannons note that a bankruptcy court may order cancellation under section 1222(b)(8), which provides that a plan may "provide for the sale of all or any part of the property of the estate or the distribution of all or any part of the property of the estate among those having an interest in the property." *Id.* § 1222(b)(8). Third, a bankruptcy court "shall confirm a plan"

under Chapter 12 if, among other things, "with respect to each allowed secured claim provided for by the plan ... the debtor surrenders the property securing such claim to such holder." *Id.* § 1225(a)(5)(C).

These provisions arguably authorize or require a court to order the retirement of Land Bank stock, despite the specific farm credit statutes which apparently preclude such an action. The debtors point to a significant body of legislative history surrounding the enactment of Chapter 12 indicating a Congressional intent to aid farmers in these desperate years and to overcome some of the shortcomings in prior bankruptcy law.[13] The debtors conclude by stating that equity requires the court to order the retirement of the stock in order to implement the spirit of Chapter 12.

In general, the Court must strive to construe these two statutory schemes so as to be consistent with each other. *See, e.g., United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1184 (6th Cir.1982), *aff'd on other grounds*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). It must attempt to give effect to each statute, if it is possible to do so while preserving their sense and purpose. *Watt v. Alaska*, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). Unfortunately, after examining the statutes cited by counsel, the Court cannot reconcile the plain text of Chapter 12 with

**11.** Section 615.5255(a) provides:
Where the debt of a holder of capital stock or participation certificates issued by a production credit association or Federal land bank association is in default, the association may, but shall not be required to, retire at book value, not exceeding par or face value, all or part of the equity owned by such borrower on which the association has a lien as collateral for the debt, in total or partial liquidation of the debt.
This provision is applicable only if the Shannons' stock is in the Federal Land Bank Association of Columbus, which 12 U.S.C. § 2034(a) would suggest, *see supra* note 9.

**12.** Stock shall be retired and paid at book value not to exceed par, as determined by the association, upon the full repayment of the loan and if the loan is in default may be cancelled for application on the loan, or under other circumstances, for other disposition, when approved by the bank.
12 U.S.C. § 2034 (1982) (omitted 1988). For this proposition, the Land Bank cited both

§ 2034(a) and 12 U.S.C. § 2131(d) (1982). Only § 2034(a) would be relevant under the old law, because § 2131(d) applies only to banks for cooperatives.

**13.** *See, e.g.,* 132 Cong.Rec. S15,075 (daily ed. Oct. 3, 1986) (statement of Sen. Thurmond) ("The legislation is meant to assist those farmers who have the true potential to reorganize and to allow them relief from heavy debt burden, and yet allow farmers to pay creditors what is reasonable under today's difficult economic situation."), *reprinted in* App. 3 *Collier on Bankruptcy* XXII–14, XXII–15 (L. King ed. 1987).

Thurmond continued by saying, "It is recognized that creditors should not shoulder all the burden of the current farm crisis and that creditors are at risk as well. When administering this chapter 12, the courts should strive to preserve this equity balance between creditors' and debtors' rights." *Id.,* App. 3 *Collier on Bankruptcy* at XXII–15.

the farm credit laws. The three relevant general sections of Chapter 12 seem to permit that which the Agricultural Credit Act prohibits: forcing the Land Bank to retire the stock.

Given this apparent conflict, the Court must turn to other means in order to render a proper construction of these statutes and to give effect to both statutory schemes insofar as possible. Specifically, the legislative intent behind the relevant bankruptcy and farm credit laws is relevant to determine how these two statutory schemes interact. Such an intention, if discoverable, would be critical in the interpretation of the relevant statutes.

## B. *Congressional Intent*

In divining what Congress intended when it passed the farm credit laws and the arguably conflicting Chapter 12 provisions, a number of guides to statutory construction are helpful. The first applicable guide is that the Court may presume that Congress intends for narrower, more specific statutes to take precedence over contrary general ones, regardless of their temporal sequence. *See, e.g., Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980); *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976).

Application of this rule suggests that the Land Bank should prevail as it did in the bankruptcy court. The provisions of the Agricultural Credit Act are quite specific; they address exactly the condition under which borrowers may redeem their stock. The relevant statute indicates that the debtors have no right to compel the Land Bank to retire the stock, but rather the lending institution has the sole discretion to cancel the stock. 12 U.S.C.A. § 2154a(c)(1)(I) (West Supp.1989).

By contrast, the Shannons invoke bankruptcy statutes which only generally affect the rights of secured creditors. Over the objection of creditors, a debtor's plan may alter the rights of secured creditors and may satisfy secured claims by the distribution to the creditors of the collateral supporting these claims. Arguably, these statutes permit or require retirement when a debtor so provides in a plan, but such a result is not clear from the face of the statutes and stems only from a claim that such a procedure is one generally within the authorization of 11 U.S.C. §§ 1222(b)(2), (8), 1225(a)(5)(C) (Supp. IV 1986).

Thus, the applicable sections of the Agricultural Credit Act are more specific than the Chapter 12 provisions cited by the debtors. If the Court presumes that Congress intended the more specific statute to take precedence over the more general one, the Court can reach a tentative conclusion that Congress did not intend to permit a surrender of stock in bankruptcy plans. Application of this presumption, though, cannot end the analysis.

Another guide to statutory interpretation provides that general statutes may prevail over specific ones if, but only if, the Court finds a clear Congressional intention supporting that result. *See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987); *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). Here, if the Shannons can show evidence of a specific intention to allow Chapter 12 debtors to surrender their stock, the Court will vacate the confirmation order and permit the debtors to surrender their stock. Otherwise, this court must abide by the more specific provisions prohibiting retirement without the consent of the Land Bank.

According to the debtors, the legislative history of Chapter 12 [14] shows that Congress wished to aid farmers and that courts must balance the interests of creditors and debtors. They point to a number of pronouncements which support this proposition, *see, e.g., supra* note 13. Such

---

14. *See* H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 48–51 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 5246, 5249–5252; 132 Cong.Rec. S15,074–94 (daily ed. Oct. 3, 1986), *reprinted in* App. 3 *Collier on Bankruptcy* XXII– 14 to –65 (L. King ed. 1987); 132 Cong.Rec. H8986–9002 (daily ed. Oct. 2, 1986), *reprinted in* App. 3 *Collier on Bankruptcy* XXII–2 to –14 (L. King ed. 1987).

a balancing procedure would permit the courts to require the Land Bank to retire the stock.

The debtors argue, moreover, that the Court must read the Congressional intent in enacting Chapter 12 broadly so as to defeat what otherwise would be a clear statutory prescription. They cite *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), for the general proposition that the fresh start purpose of the Bankruptcy Code allows the debtors to take unilateral action pursuant to a general textual warrant in a Code provision, despite contrary specific statutes. *See In re Neff*, 89 B.R. 672, 675 (Bankr.S.D.Ohio 1988), *modified on other grounds*, 96 B.R. 800 (Bankr.S.D.Ohio 1989); *In re Massengill*, 73 B.R. 1008, 1012 (Bankr.E.D.N.C.1987), *rev'd*, 100 B.R. 276 (E.D.N.C.1988). *Bildisco* held that the power of trustees to abrogate executory contracts, 11 U.S.C. § 365 (1982 & West Supp.1989), extended to collective bargaining agreements, despite a specific statutory prohibition of such actions under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (5) (1982). The debtors' argument, however, is not convincing.

First, although the Shannons claim that *Bildisco* permits the general provisions of Chapter 12 to trump the Agricultural Credit Act in light of the intent to help farmers, such a reading of *Bildisco* stretches the case far beyond its facts and falls outside the reasonable scope of the case's holding. *Bildisco* interprets section 365 of the Bankruptcy Code and its relation to the NLRA, while this case concerns the impact of Chapter 12 on the Farm Credit Act and the Agricultural Credit Act. The controversy in *Bildisco* and the case at bar involve completely separate statutory schemes and invoke entirely different policy considerations. In short, an analysis of section 365, analyzing its priority in relation to other federal statutes, is not helpful in the interpretation of 11 U.S.C. §§ 1222(b)(2), (8), 1225(a)(5)(C).

Second, *Bildisco* did not relieve the debtor of its obligations under the NLRA altogether. 465 U.S. at 524, 526, 534, 104 S.Ct. at 1195, 1196, 1200. The NLRA requires the trustee to make a stronger showing that abrogation is necessary when rejecting a collective bargaining agreement than when a trustee rejects any other kind of executory contract. *Id.* at 524, 104 S.Ct. at 1195. The NLRA requires the parties to negotiate a voluntary modification before rejecting the contract and the trustee must show that negotiations are "not likely to produce a prompt and satisfactory solution." *Id.* at 526, 104 S.Ct. at 1196. Finally, the debtor, as an "employer," is "obligated to bargain collectively with the employees' certified representative over the terms of a new contract pending rejection of the existing contract or following formal approval of rejection by the Bankruptcy Court." *Id.* at 534, 104 S.Ct. at 1200.

Similarly, simply filing a Chapter 12 petition should not relieve the Shannons of their obligations under the Agricultural Credit Act completely. Even if applicable, the force of *Bildisco* would, at most, mandate retirement only upon a strong showing by the debtors that the stock burdens the estate, that the equities balance in favor of surrender, and that attempts to reach an agreement with the Land Bank would not likely produce a prompt and satisfactory solution. *Cf. id.* at 526, 104 S.Ct. at 1196 (analogous standard for 11 U.S.C. § 365). Such a showing would be difficult here because, for instance, the small amount of stock would have little impact when set off against the large principal and therefore retirement would not likely make the difference between a successful and an abortive reorganization.[15]

Finally, the general principle advanced by the debtors has no logical endpoint. They posit that the fresh start purpose of Chapter 12 entails that actions authorized by general bankruptcy statutes are permissible, despite their inconsistency with other, more specific statutes. Congress could not

---

**15.** The Shannons currently own $10,000 worth of stock but the allowed secured claim is over $200,000.

have intended to brush aside every law which is inconsistent with the Bankruptcy Code willy-nilly; and nothing in the *Bildisco* opinion would justify such a broad principle. Even if the courts accept the debtors' argument, they must choose some logical limit. The debtors can point to no such boundary. Instead of sliding down the slippery slope which the debtors entice the Court to mount, the Court concludes that *Bildisco* and the general intention of Congress to aid farmers is no substitute for evidence of a specific intention of Congress to permit Chapter 12 debtors to surrender their stock pursuant to a bankruptcy plan.

In short, the debtors have established that Congress had a general intention to aid farmers when it enacted Chapter 12. The debtors, though, cannot cite more specific segments of its legislative history which would manifest a specific Congressional intention to override the relevant provisions of the then-current Farm Credit Act. Under the general presumption that Congress intended for narrow, specific laws to prevail over general ones, the Court must conclude therefore that the Congress did not intend to permit Chapter 12 debtors to surrender their stock under a bankruptcy plan. The debtors' invocation of Congress' general injunction for courts to help the farmers, to balance the interests, and to do equity cannot defeat a clear statutory prescription, provided for in the Farm Credit Act and its successor, the Agricultural Credit Act.

To bolster this conclusion, additional evidence suggests that Congress did not intend Chapter 12 to override the redemption provisions of the Farm Credit Act. First, stock participation plays a crucial role in the farm credit system, a fact which Congress emphasized. "It is the objective of this chapter to continue to encourage farmer- and rancher-borrowers participation in the management, control, and ownership of a permanent system of credit for agriculture...." 12 U.S.C. § 2001(b) (1982). The Supreme Court noted that Congress designed restrictions on stock retirement to "provide both a stable membership and permanent capital, two necessities for the success of any cooperative venture." *United*

*States v. Mississippi Chem. Corp.*, 405 U.S. 298, 309, 92 S.Ct. 908, 914, 31 L.Ed.2d 217 (1972). Such an emphasis on stock participation supports, rather than contradicts, a Congressional intention to require retention of stock after confirmation.

The second datum manifesting a Congressional intention to preclude forced cancellation is the fact of the enactment of the Agricultural Credit Act. Congress enacted Chapter 12 in the Bankruptcy Judges, United States Trustees, and Family Farmer Act of 1986 on October 27 of that year. Pub.L. No. 99–554, 100 Stat. 3088 (codified at 11 U.S.C. §§ 1201–1231 (Supp. IV 1986)). Subsequently, Congress enacted the Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1568 (1988), as a general recodification of the farm credit statutory scheme formerly governed by the Farm Credit Act. In that recodification, Congress provided again for lending institutions to have the sole prerogative to retire stock they issued, despite the ostensibly inconsistent Chapter 12 which it had just enacted. 12 U.S.C.A. § 2154a(c)(1)(I) (West Supp.1989) (retirement is "at the discretion of the institution"); *see supra* notes 11–12 and accompanying text.

Moreover, the Agricultural Credit Act provided that its capitalization provisions "shall not be construed to affect the provisions of this chapter that confer on System institutions ... the *privilege* to retire or cancel such stock or other equities for application against the indebtedness on a defaulted or restructured loan." *Id.* § 2154a(f) (emphasis added). Section 2154a(f), then, preserves the Land Bank's sole discretion to retire its stock. Furthermore, this statute states that system institutions have the "privilege" to retire stock. The Court may presume that Congress was aware of the scope of Chapter 12 when it enacted the Agricultural Credit Act, under the debtors' assumption that they pertain to the same subject matter. *See Jones v. St. Louis–S.F. Ry.*, 728 F.2d 257, 262 (6th Cir.1984). Thus, if the Shannons were correct that Congress intended for Chapter 12 to take precedence over section 2154a(c)(1)(I), Congress would have noted

in the subsequently-enacted section 2154a(f) that lending institutions have a "duty" to retire stock under certain circumstances, and not just a "privilege." [16]

These provisions of the Agricultural Credit Act cannot constitute legislative history of Chapter 12. That is, they cannot demonstrate that the Congress which enacted Chapter 12 did not intend it to trump the farm credit laws, for it is the intent of the Congress which enacted Chapter 12 that determines the application and interpretation of the statutes within it. *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979).

Nevertheless, the fact that Congress reiterated an intention to place the privilege to retire in the hands of lending institutions after it had enacted Chapter 12 is relevant and is entitled to some weight in determining what Congress intended, especially when the legislative intent is not clear. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980). Here, the legislative history is indeed somewhat uncertain; an analysis of the legislative history of Chapter 12 reveals no express specific intent concerning stock redemption either to permit or forbid redemption during bankruptcy. The only evidence in the legislative history concerning redemption is general or only obliquely probative. Thus, the fact that the Agricultural Credit Act, enacted after Chapter 12, reestablishes that lending institutions have the sole discretion to retire stock suggests that Congress intended that the relevant Chapter 12 provisions would not override the farm credit laws.

In sum, an analysis of the legislative intent regarding the farm credit laws and Chapter 12 suggests that Congress did not intend to permit bankruptcy debtors to surrender their land bank stock to set off a like amount from the allowed secured claim. The Court presumes that Congress intended that the narrower, more specific farm credit statutes would have precedence here over the more general, arguably conflicting Chapter 12 provisions. Moreover, given that Congress underscored the importance of stock ownership and given the Agricultural Credit Act, in which Congress reiterated its intention to place the discretion to retire in the hands of farm credit institutions, this Court must reach the tentative conclusion that a bankruptcy court may not force the Land Bank to retire the debtors' stock.

### C. *Precedent*

An examination of the case law on this issue confirms the Court's conclusion that the debtors must retain their stock. The debtors point to one prominent bankruptcy case which permitted coerced retirement of stock, *In re Massengill*, 73 B.R. 1008, 1009–12 (Bankr.E.D.N.C.1987), *rev'd*, 100 B.R. 276 (E.D.N.C.1988). Some cases followed this court's reasoning completely.[17] Other courts accepted it to some extent.[18] The United States District Court for the

---

**16.** The legislative history of the Agricultural Credit Act also evinces an intention to place sole discretion to retire in the hands of Farm Credit System institutions. The House report contains the language granting institutions the "privilege to retire" stock upon default. H.R.Rep. No. 295(I), 100th Cong., 1st Sess. 110 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin. News 2723, 2781. The Conference Committee adopted Senate language which provided that "bylaws must permit the retirement of the stock at the discretion of the institution." H.R.Conf.Rep. No. 490, 100th Cong., 1st Sess. 248 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2956, 3043.

**17.** *In re Neff*, 89 B.R. 672, 673–75 (Bankr.S.D. Ohio 1988), *modified on other grounds*, 96 B.R. 800, 802 (Bankr.S.D.Ohio 1989) (denying a motion to amend or alter its earlier holding on this

issue); *In re Ivy*, 86 B.R. 623, 624, 625 (Bankr. W.D.Mo.1988); *see also In re Miller*, 98 B.R. 311 (Bankr.N.D.Ohio 1989); *cf. In re Chaney*, 87 B.R. 131, 134 (Bankr.D.Mont.1988) (pertaining to production credit association stock).

**18.** *In re Greseth*, 78 B.R. 936, 942–44 (D.Minn. 1987) (affirming plan permitting partial redemption of stock after a write off of a portion of the loan, but requiring retention of stock in the amount of 5% of the adjusted value of the mortgaged land); *In re Arthur*, 86 B.R. 98, 101–03 (Bankr.W.D.Mich.1988) (court permitted debtors to "surrender" stock but did not discharge the indebtedness on account of the purchase money loan for the stock; instead, it changed claim on account of the loan from secured to unsecured).

Eastern District of North Carolina, however, reversed the bankruptcy court and held that the farm credit laws do not permit bankruptcy courts to confirm Chapter 12 plans which compel the retirement of land bank stock. *In re Massengill*, 100 B.R. 276 (E.D.N.C.1988). Accordingly, this reversal undermines the line of cases following the bankruptcy court's opinion.

Moreover, the Court finds the *Massengill* district court opinion to be much more persuasive than the bankruptcy court's opinion. The district court's holding is consistent with a long line of Chapter 11 cases.[19]

Furthermore, the lower court based its reasoning upon the kind of broad reading of the relevant legislative history under *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which the Court rejected above. *See supra* text accompanying notes 14–15. Finally, the only case cited by the bankruptcy court to support its departure from the established position under Chapter 11 does not in fact bolster its holding.[20] The cases following the bankruptcy court's opinion, *see* cases cited *supra* note 17, accordingly succumb to the same flaws.[21]

**19.** *See In re Foss*, 76 B.R. 719, 723 (Bankr.D.N.D. 1987); *In re Eisenbarth*, 77 B.R. 228, 235 (Bankr.D.N.D.1987); *In re Stedman*, 72 B.R. 49, 52–53 (Bankr.D.N.D.1987); *In re Walker*, 48 B.R. 668, 668–70 (Bankr.D.S.D.1985); *In re Cooperativa Cafeteros*, 19 B.R. 732, 734 (Bankr.D.P. R.1982); *cf. In re McElwaney*, 40 B.R. 66, 67–72 (Bankr.M.D.Ga.1984) (land bank had discretion to retire stock to satisfy its claim over objection of trustee).

**20.** The lower court relied solely on *Columbia Bank for Cooperatives v. Lee*, 368 F.2d 934 (4th Cir.1966), *cert. denied*, 386 U.S. 992, 87 S.Ct. 1308, 18 L.Ed.2d 338 (1967). *Columbia Bank* concerned a cooperative which, in the course of liquidation, faced the possibility of either a forced sale of its stock at a distress price or a set off of the stock at full value against the principal. As between a forced sale and a set off, the equitable doctrine of marshalling required a set off.

*Columbia Bank* is not applicable here or to the situation in *Massengill.* The debtors filing under Chapter 12 were not liquidating their assets and thus did not face the choice of a distress sale or set off. Indeed, the question is one of whether to liquidate the stock or not, a question which the bankruptcy court must answer before considering, as *Columbia Bank* did, the procedure for liquidation.

**21.** Another court which drew support from the bankruptcy court opinion in *Massengill* was flawed in a slightly different way. *In re Arthur*, 86 B.R. 98 (Bankr.W.D.Mich.1988). In *Arthur*, the court permitted the debtors to "surrender" their stock under 11 U.S.C.A. § 1225(a)(5)(C) (Supp. IV 1986). *Arthur* claimed that these actions were consistent with the Farm Credit Act, since "surrender" in this case was not "retirement," "redemption," or "cancellation" which the Farm Credit Act had prohibited. *See id.* at 102–03.

The court argued that "surrender" was not "retirement" because the court did not discharge the indebtedness secured by the stock. The debtors had borrowed money from the bank to purchase the stock and the court altered the bank's claim relating to this loan from secured to unsecured after the surrender, presumably under 11 U.S.C. § 506(a) (1982). Section 506(a) permits the court to limit the secured claim to the value of the collateral and relegate the balance of the claim to the unsecured category.

Here, although the court did not mention § 506(a) expressly, it stated that the stock was worthless. According to the court, the stock had no worth because the debtors had no "equity in the stock," stating that the "amount owed by the Debtors [on the loan used to buy the stock] appears to be greater than the value, if any, of the stock," *id.* at 103 n. 4. Despite the usual requirement that the court value the stock in applying § 506(a) to reduce the secured portion of the claim, the court stated that it declined to determine the value of the stock. *Id.* at 103. Nonetheless, the court treated the stock as if it were worthless and therefore treated the claim on account of the stock as entirely unsecured. Therefore, the court changed the whole claim on account of the stock from secured to unsecured. Once the court declared the stock to be worthless, it also permitted its surrender under § 1225(a)(5)(C).

This Court, however, rejects the *Arthur* approach to surrender, since it arises from a misconstruction of § 1225(a)(5)(C). On one hand, if the court considers the stock worthless and treats the entire claim as unsecured, then § 1225(a)(5)(C) does not apply. Section 1225(a)(5)(C) applies only to secured claims. On the other hand, if § 1225(a)(5)(C) does apply then a "surrender" of the collateral would amount to retirement, which the farm credit laws prohibit.

Section 1225(a)(5) offers three ways in which a debtor's plan may satisfy a secured claim: an arrangement with the creditor, paying the creditor an income stream with a net present value equal to the value of the collateral, or "surrendering" the collateral. Each of these methods satisfies completely the indebtedness which the collateral had secured. Thus, when the Arthurs surrendered their stock, the creditor's claim should have been satisfied completely, and not just changed from secured to unsecured. Dis-

The only other district court to consider this issue required the debtors to retain stock in the amount of 5% of the adjusted loan principal. *In re Greseth,* 78 B.R. 936 (D.Minn.1987). The bankruptcy court had written down the value of the land and thus had included only part of the loan principal in the secured claim. *Greseth* permitted retirement of a quantity of stock corresponding to the amount that the court had written down the principal, that is an amount of stock equal to 5% of the sum written off; but *Greseth* required the debtors to retain the rest of their stock, equalling 5% of the new, lower principal.[22] 78 B.R. at 943.

*Greseth* does not support the debtors' position. First, it did not permit the debtors to retire all of their stock, as the Shannons proposed. Instead it required the debtors therein to retain a quantity of stock corresponding to the statutory percentage of the adjusted loan amount. Second, the *Greseth* reasoning would not even require partial redemption here, since the court below did not write down the value of the loan principal.[23]

In sum, the case authority regarding retirement of stock supports the conclusion that a bankruptcy court may not confirm a Chapter 12 plan providing for the surrender of farm credit institution stock. One district court reached the same conclusion. It draws support from the Chapter 11 cases, in which the courts universally refused to force the relevant lending institution to retire the stock. Also, the only other district court to consider this issue required the debtors to maintain the statutory percentage ownership of stock after bankruptcy. Finally, the bankruptcy court opinion in *Massengill* and its progeny are not persuasive.

**D. *The Equities***

Although the debtors cannot prevail by garnering support from the legislative history of the relevant statutes and case authority, they argue nonetheless that the Court has considerable equitable powers and that it should utilize this authority to permit the Plan to require retirement of the stock. The debtors maintain that Chapter 12 bestows a degree of equitable power on the courts which permit them to order retirement, even if they were unable to do so under Chapter 11.

In order to prevail on this argument, the debtors must demonstrate that the marginal addition to the court's equitable authority bestowed by Chapter 12 is sufficient to enable it to override the plain language and legislative history of the farm credit statutes. Moreover, they must show that the balance of the equities tips in their favor. The debtors fail to advance adequate grounds for such a position.

First, under Chapter 11, the courts had a comparable degree of equitable power which they might have used to defeat the Farm Credit Act. In discussing Chapter 11, the Supreme Court noted that the "Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482

charging the claim completely, as § 1225(a)(5)(C) requires, amounts to redemption of the stock: a return of the stock to the creditor in exchange for a discharge of the debt. This Court cannot permit such "surrender" of the stock since the Agricultural Credit Act bars such an action.

**22.** Congress codified, in the Agricultural Credit Act, a similar procedure for partial retirement of stock after a lending institution has written off part of the principal. 12 U.S.C.A. § 2202b(a) (West Supp.1989). Section 2202b(a), however, provides that the land bank association would cancel an amount of stock equal to the amount of the write-off up to the value of the stock.

**23.** *Greseth,* however, is not consistent with this Court's decision either. It permits the retirement of some stock, albeit in the limited fashion described above, whereas the district court in *Massengill* and this Court do not believe that the farm credit laws permit any cancellation at all without consent of the Land Bank.

The Court finds the *Greseth* approach to be desirable and since the new law requires participation only in the amount of 2% or $1,000, whichever is less, it would be even better to permit bankrupt debtors to retain stock equalling only 2% of the allowed secured claim (whether written down or not) or $1,000 whichever is less. Unfortunately, the farm credit laws authorize neither of these approaches.

(1984). Despite its vast power of equity under Chapter 11, however, each court considering the stock redemption issue under Chapter 11 declined to override the specific provisions of the Farm Credit Act. *See* cases cited *supra* note 19.

Second, the balance of equities does not tip in the Shannons' favor to an extent which would justify overriding the legislative history and case law regarding the germane statutes. On one hand, the debtors are correct that Congress intended Chapter 12 to aid farmers and to remedy difficulties in prior law. Certainly the plight of the American farmers justifies special legislation. On the other hand, the relief sought by the debtors adversely affects the ability of lending institutions to raise capital.

Although the redemption of one farmer's shares would not likely wreck the financial structure of the Land Bank, the Court is mindful of the precedential effect of such a decision. If each and every bankrupt borrower hereafter were to secure retirement of Land Bank stock in its Chapter 12 plan, the effect would be cumulative and may be significant. Such an impact may adversely affect the very system which allowed farmers like the Shannons to enter the business in the first place. And a collapse of the farm credit system would hurt farmers in the long run more than a short-run refusal to allow surrender.

Moreover, the value of the stock comprises such a small percentage of the allowed secured claim that retirement would not likely make the difference between a successful or an unsuccessful plan. The Court is mindful that any amount, no matter how small, would help the debtors. But an amount this small does not provide a compelling equitable argument for the debtors which would be powerful enough to persuade the Court to alter its conclusion of the legal issues.

In the end, the debtors would have the court balance the farmers' short-run, certain, lost opportunity to retire a small amount of stock against a long-run, less certain, but greater injury resulting from an impaired farm credit system. The Court finds that this balance approaches equipoise. Thus, the Court finds insufficient equitable support for defeating the effect of a clear statutory prescription precluding retirement.

### E. *Section 506(b) as a Limit to Compulsory Stock Participation*

The only remaining argument that the debtors raised is the claim that section 506(b) of the Bankruptcy Code requires the Land Bank to cancel the stock since secured creditors may receive "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which the claim arose" only to the extent that the value of the collateral exceeds the creditor's secured claim. 11 U.S.C. § 506(b) (1982 & Supp. IV 1986). The debtors state that the Land Bank "is only entitled to enforce its rights up to the value of the collateral." Appellants' Brief at 32. That is, they construe this statute to mean that if a court may order the Shannons to retain the stock, it can do so only if, and to the extent that, the Land Bank's claim is oversecured.

In general, 11 U.S.C. § 506(a) (1982) bifurcates a partially secured or undersecured claim "into separate and independent secured claim and unsecured claim components." 3 R. Babitt, A. Herzog, H. Novikoff & M. Sheinfeld, *Collier on Bankruptcy* ¶ 506.04, at 506–15 (15th ed. 1987) [hereinafter "3 *Collier on Bankruptcy* "]. Section 506(b) allows the creditor to include post-petition interest, charges, and fees in its allowed secured claim, but only to the extent that such items would be secured by collateral in addition to that securing the rest of the allowed secured claim.[24] Al-

---

**24.** *See* S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5854; H.R.Rep. No. 595, 95th Cong., 1st Sess. 356–57 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6312; 124 Cong.Rec. S17,411 (daily ed. Oct. 6, 1978) (state-

ment of Sen. DeConcini), *reprinted in* App. 3 *Collier on Bankruptcy* X–7, X–24 (L. King ed. 1988); 124 Cong.Rec. H11,095 (daily ed. Sept. 22, 1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 6436, 6451 (statement of Rep. Edwards).

though unclear, the debtors position seems to be that the mandatory stock ownership provision is some sort of fee, cost, or charge.

■ Section 506(b), however, is wholly irrelevant to land bank stock ownership and retirement. First, the Land Bank's right to compel the Shannons to retain the stock is not itself a "claim" or includible in a "claim," which the Land Bank must either assert in bankruptcy or lose. A "claim" is a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," 11 U.S.C. § 101(4) (1982); the Land Bank's right is not a "claim" since it is neither of these.

The Shannons' stock does not represent a debt to the Land Bank, which could be divided into secured or unsecured portions. Nor is stock participation some contractual duty of future performance which the debtors could breach.[25] To the contrary, stock participation is equity ownership in the Land Bank. *In re Stedman,* 72 B.R. 49, 53 (Bankr.D.N.D.1987). The stock represents value which the Shannons, not the Land Bank, may recover when they discharge their loan obligation. Therefore, since section 506(b) places a limit only on the amount of the allowed secured claim, and stock participation is not included in the claim, section 506(b) is completely inapplicable here.[26]

Second, even if stock participation were a claim against the estate, section 506(b) would not apply. Aside from questions as to "interest," "fees, costs, or charges," "the allowance of claims will not generally be determined by reference to section 506." 3 *Collier on Bankruptcy, supra* p. 28, ¶ 506.04, at 506–17. Instead, the allowance and disallowance of claims falls under section 502. The sole exception is interest, fees, costs, and charges.

Third, stock participation is not within the categories of "interest," "fees, costs, or charges," the includibility of which could be vulnerable to the section 506(b) limit. Again, stock participation is equity ownership in the bank. *Stedman,* 72 B.R. at 53. Just as stock participation is not a contractual obligation to pay money, which could be included in a claim, participation is also not a supplemental debt charged in the form of a fee. In fact, the stock is collateral, which itself boosts the amount of debt which may be secured or the amount of "interest," "fees, costs, or charges" which are allowable.

Finally, even assuming that stock ownership were somehow in the class of "interest," "fees, costs, or charges," section 506(b) would not apply. The "interest," "fees, costs, or charges" limited in section 506(b) refer only to those which arise in connection with the assertion of the allowed claim, *see* 3 *Collier on Bankruptcy supra* p. 28, ¶ 506.01, at 506–2.[27] That is,

25. The debtors did contract to abide by the Farm Credit Act when they mortgaged their property, which required a stock purchase. They made the requisite purchase in 1975. The only remaining way to breach the stock purchase requirement is to retire the stock, which only the Land Bank can do. They cannot unilaterally breach the contract. Accordingly, stock participation is not a future performance obligation which could justify specific performance upon a breach and an alternative right to payment upon refusal to perform.

26. Indeed, the inability to fit stock ownership into the definition of a "claim" shows the incoherence of the debtors' argument. The Shannons argue that the Land Bank can assert its right to insist on stock participation only to the extent that its claim is oversecured. One interpretation might be that if the Land Bank is only oversecured by $1, the Shannons can force it to retire all but $1 of the stock they hold. Another

reading might be that the Land Bank can insist that the Shannons retain all of their stock when it is oversecured, even if the collateral exceeds the claim by only $1.

This conceptual difficulty demonstrates the inapplicability of this statute to an obligation to retain stock under the farm credit laws. Section 506(b) normally determines the extent to which a creditor can include in its secured claim a quantifiable debt or right of payment stemming from a breach of duty. It can identify to the penny the amount of fees, costs, charges, and pre-confirmation interest includible in the secured claim. The statute, however, cannot quantify a minimum degree of stock participation which the debtors must maintain after a Chapter 12 bankruptcy.

27. "Section 506 ... covers ... the extent to which the holder of an allowed claim may be allowed postpetition interest *thereon* and fees,

section 506(b) limits the includibility of costs such as *postpetition*[28] (but pre-confirmation) "interest," *late* "fees," *default* "costs," and *delinquency* "charges," costs having to do with the bankruptcy. The requirement of stock participation arose when the Shannons initiated their loan and had nothing to do with the present bankruptcy. Thus, section 506(b) could not change the Shannons' obligations to retain stock participation after the effective date of the Plan.

In sum, the debtors' invocation of section 506(b) is incorrect. Section 506(b) is not relevant to the allowance of claims outside the narrow category of costs having to do with the filing of bankruptcy and default. Stock ownership is not such a cost. Therefore, the Court holds that section 506(b) does not authorize the bankruptcy court to confirm a Chapter 12 plan which provides for the retirement of the debtors' stock in the Land Bank.

### F. *Conclusion*

The Court is mindful that "[f]amily farmers hold a special place in our Nation's history and folklore." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 970, 99 L.Ed.2d 169 (1988). The debtors herein "paint a grim picture of the problems facing farm families today, and present an eloquent appeal for action on their behalf." *Id.* The Court, however, must resist the temptation to alter the Agricultural Credit Act and Chapter 12 by judicial fiat to cure what some may argue is a Congressional oversight for failing to amend Chapter 12 in order to permit the retirement of stock.[29]

An amendment to Chapter 12 and the Agricultural Credit Act to permit a plan to force banks to cancel the stock may very well be appropriate. Commentators might testify in favor of it; such an amendment might increase the chances for successful reorganization and might constitute sound public policy. An inquiry into the virtues and shortcomings of such a proposal here, however, would be far beyond the institutional competence of this Court. Congressional hearings would provide the proper venue for a debate on the merits of the idea. Thus, adoption of such a proposal would be inappropriate here.

The Court notes that family farmers are in desperate need of all possible assistance. "Yet relief from current farm woes cannot come from a misconstruction of the applicable bankruptcy [and farm credit] laws, but rather, only from action by Congress." *Id.* (footnote omitted). Until Congress amends Chapter 12 or the Agricultural Credit Act, then, this Court cannot find error in a bankruptcy court's confirmation order which compels the debtors to retain their Land Bank stock.

### II. THE DISCOUNT RATE UNDER SECTION 1225(a)(5)(B)(ii)

The second issue on appeal concerns the discount rate applicable to the payments made under the Shannons' Chapter 12 plan. Under Chapter 12, a bankruptcy court must confirm a debtor's plan if, with respect to each allowed secured claim, "the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C.

costs or charges *arising in connection therewith....*" *Id.* (emphasis added).

**28.** In *United States v. Ron Pair Enters., Inc.,* — U.S. —, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Supreme Court treated the question of interest includible in a secured claim under the limit of § 506(b). The Court operated under the assumption that the "interest" to which § 506(b) refers is *postpetition* interest. *Id.* 109 S.Ct. at 1030.

**29.** The Court's holding requires the Shannons to retain stock in the amount of 5% of the value of their loan, despite the fact that new borrowers need only purchase stock equalling 2% of their loans or $1,000, whichever is less. An interesting compromise might be to allow the Shannons and all other borrowers under the old Farm Credit Act to retire an amount necessary to leave the debtors with the same stock minimum of 2% or $1,000, whichever is less. Unfortunately, this Court is without power to implement such a compromise given the lack of statutory authority, but perhaps Congress should adopt such a proposal in order to treat new and old borrowers the same.

§ 1225(a)(5)(B)(ii) (Supp. IV 1986). That is, a Chapter 12 plan is adequate if it provides for an income stream to each secured creditor which, when discounted by a certain "discount rate," has a present value that is equal to the value of the allowed secured claim.

The variables in the equation to determine the present value of an income stream include the discount rate, the number of payments to be made under the plan, the amount to be paid per periodic payment, and, of course, the present value itself.[30] Normally, the bankruptcy court establishes the length of the plan, that is, the number of payments, and the discount rate. The present value of the income stream must be equal to the secured claim. *Id.* As a result the only remaining unknown variable would be the amount to be paid per period, which the parties or the bankruptcy court could calculate.[31]

The court below approved a thirty-year plan. The collateral is worth $207,000. This amount sets the limit on the value of the Land Bank's allowed secured claim. 11 U.S.C. § 506(a) (1982). The bankruptcy court imposed a discount rate of 12.5% on the debtors when it confirmed the Plan. *See supra* note 5 and accompanying text. The calculation of the amount that the Shannons would have to pay each year, then, would normally be a simple matter of applying the real data to the standard formulae. In this case, however, the parties disagree as to the proper discount rate. In other words, the parties would agree upon the amount to be paid per year under the Plan using the standard formulae, but they must first establish a discount rate for use in the standard formulae.

The debtors contend that the bankruptcy court erred because the 12.5% discount rate it imposed is excessive. The Shannons state that the Court should determine a fair rate to compensate the Land Bank for the time value of money. They claim, though, that the discount rate should not compensate the Land Bank for costs which it would not incur in its role as secured creditor in a bankruptcy case, such as ad-

---

**30.** Where PV = present value, SC = the amount of the allowed secured claim, d = the discount rate, n = the number of payments, and A = the amount to be paid per period:

$$PV = SC = A \left[ \frac{1 - \dfrac{1}{(1 + d)^n}}{d} \right]$$

---

This equation assumes that the debtors will make the first payment under the plan at the end of the first period, for example at the end of the first year of the plan. The Plan here schedules the first payment for December, 1987. Thus, the Shannons must adjust the annual payment in the Plan to account for the early commencement of periodic payments.

**31.** It is possible to solve the present value equation, *supra* note 30, to determine the amount that the debtor should pay per period. Where SC = the amount of the allowed secured claim, d = the discount rate, n = the number of payments, and A = the amount to be paid per period:

$$A = SC \left[ \frac{d}{1 - \dfrac{1}{(1 + d)^n}} \right]$$

ministrative, collection, and transaction costs. A fair rate, the debtors suggest, would be that which is 1% above the Land Bank's cost of capital. The Land Bank's cost of capital is 6.9%. Stipulated Exhibit A at 84 (testimony of Alan Singleton). Thus, the Shannons are proposing a discount rate of 7.9%. In the alternative, they request the Court to impose a discount rate equivalent to that applicable on the confirmation date to 52–week treasury notes with an added percent for risk.

By contrast, the Land Bank argues that the rate of interest that the Land Bank charges for new real estate loans to persons similarly situated to the Shannons is binding as a matter of law on the bankruptcy court in ascertaining the proper discount rate under section 1225(a)(5)(B)(ii). The Land Bank contends that if it were to issue a new loan to the Shannons, they would qualify at best for a 12.5% interest rate. In the alternative, the Land Bank claims that the proper rate is that which persons similarly situated to the Shannons could secure in the market for new real estate loans. The Land Bank, moreover, claims that its 12.5% rate is the best rate that persons like the Shannons could receive in the new loan market.

This Court must resolve the appeal by examining the bankruptcy court's confirmation order to scrutinize the legal and factual bases for its decision to impose a 12.5% discount rate. In the order, the court established only one purely factual finding, tracking the language of the relevant statute, that "the value, as of the effective date of the Plan, of property to be distributed under the plan on account of [each secured] claim is not less than the allowed amount of such claim." *In re Shannon*, No. 2–87–01597, at 1–2 (Bankr.S. D.Ohio Sept. 21, 1987). The accuracy of this finding, of course, depends on whether the court was correct in finding that 12.5% was the proper discount rate.

The court's finding that a 12.5% discount rate is appropriate is presumably the court's assessment of the rate needed to provide the Land Bank a stream of payments which has a net present value equal to the allowed secured claim. The court did not state, however, whether it chose 12.5% because of a legal conclusion that such a rate is required by the farm credit laws as the Land Bank argues in this appeal, because of a factual judgment that 12.5% is the most favorable market rate which the Shannons could receive if initiating a similar loan, or because 12.5% would be appropriate under some other method of determining discount rates. The court below, then, provided no legal rationale for choosing a certain method of ascertaining discount rates which, when applied, would yield 12.5%, nor did it present facts which formed the basis for choosing that rate.

Since the bankruptcy court's finding could be based on either a legal conclusion that the farm credit laws require a 12.5% rate or a factual conclusion, the Court must now undertake a two-part inquiry. The first step is to determine if the farm credit laws mandate the rate fixed by the bankruptcy court.[32] If so, the Court must affirm the bankruptcy court. If not, the Court must remand the case for clarification because it would not be certain if the lower court's opinion were based on an erroneous legal conclusion or a factual determination which the Court could otherwise accept unless clearly erroneous.[33] This Court would then undertake the second step of the analysis and present instructions for the bankruptcy court upon remand. Specifically, the Court would discuss the proper method for determining discount rates under 11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986). Accordingly, the Court turns now to the first inquiry, whether the Land Bank's interest rate structure for new loans controls as a matter of law the establishment of a discount rate.

---

**32.** This court can examine *de novo* the legal conclusions of the court below. *In re Caldwell,* 851 F.2d 852, 857 (6th Cir.1988).

**33.** The Court must accept the bankruptcy court's findings of fact unless they are clearly erroneous. *See, e.g., id.; In re Southern Indus. Banking Corp.,* 809 F.2d 329, 331 (6th Cir.1987); Bankr.R. 8013.

## A. *The Land Bank's Internal Rate of Interest*

The Land Bank claims that the rate of interest which it charges borrowers like the Shannons should bind the bankruptcy court in its determination of the proper discount rate under 11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986). The Land Bank relies on three provisions of the Farm Credit Act: 12 U.S.C. § 2205 (1982) (amended 1986); 12 U.S.C. § 2015 (1982 & Supp. IV 1986), *amended by* 12 U.S.C.A. § 2016 (West Supp.1989); and 12 U.S.C. § 2001(c) (Supp. IV 1986).

The Land Bank's first contention is that the Farm Credit Administration ("FCA") can regulate the proper discount rate under section 1225(a)(5)(B)(ii). For this proposition, the Land Bank cited 12 U.S.C. § 2205, which had provided: "Interest rates on loans from institutions of the Farm Credit System shall be determined with the approval of the Farm Credit Administration . . ., notwithstanding any interest rate limitation imposed by any State constitution or statute or other laws which are hereby preempted for purposes of this chapter." In other words, since the statute had granted the FCA plenary power to regulate the "interest rates" on "loans," it also gave the FCA's determinations of interest rates binding effect on the bankruptcy courts when they set "discount rates" in bankruptcy cases.

The Land Bank's second argument is that interest rates set by its own board of directors are binding on bankruptcy courts when establishing discount rates; it cited

12 U.S.C. § 2015 for this proposition. Section 2015 had provided, "Loans made by a Federal land bank shall bear interest at a rate or rates, and on such terms and conditions, as may be determined by the board of directors of the bank from time to time." [34] Finally, the Land Bank argues that "in no case is any borrower to be charged a rate of interest that is below competitive market rates for similar loans made by private lenders to borrowers of equivalent creditworthiness and access to alternative credit." 12 U.S.C. § 2001(c).

The three statutes invoked by the Land Bank, however, are inapposite. Each of them pertain to the regulation of "interest rates" on "loans." They are applicable here only if the Court accepts a crucial assumption underlying the Land Bank's position, namely, that these three statutes encompass "discount rates" in "bankruptcy" as falling within the definition of "interest rates" on "loans."

The Plan provides for an income stream to the secured creditor, the present value of which must at least equal the amount of the secured claim. 11 U.S.C. § 1225(a)(5)(B)(ii). To determine the proper amount of the income stream, a bankruptcy court must establish an appropriate *discount* rate. This is not the same as the *interest* rate for new loans set by the banks' board under section 2001(c) and old section 2015, and regulated by the FCA under old section 2205.[35] *See In re Neff,* 89 B.R. 672, 676–77 (Bankr.S.D.Ohio 1988), *modified on other grounds,* 96 B.R. 800 (Bankr.S.D.Ohio 1989); *In re Caudill,* 82

---

**34.** The Agricultural Credit Act did not make material changes in this statute. The new law provides, "Loans and discounts made by a Farm Credit Bank shall bear such rate or rates of interest or discount, and be on such terms and conditions, as may be determined by the board of directors of the bank from time to time." 12 U.S.C.A. § 2016(a) (West Supp.1989).

**35.** The Land Bank, however, may argue that a Chapter 12 plan is, in substance, a "coerced loan" from it to the Shannons, to be repaid over the thirty-year duration of the Plan. *See generally infra* note 46 and accompanying text (discussion of coerced loan theory). The "discount" rate under 11 U.S.C. § 1225(a)(5)(B)(ii) would

then be identical to the "interest" rate of the hypothetical coerced loan. Accordingly, the argument might go, §§ 2001(c), 2015, and 2205 should apply to this new "coerced loan," just as they would to a new loan in the ordinary course of business.

The coerced loan theory, however, is not the unambiguously correct way of interpreting § 1225(a)(5)(B)(ii), *see infra* notes 46–47, but even if it were, it is not clear that Congress intended §§ 2001(c), 2015, and 2205 to extend to coerced loans as well as to new loans made in the ordinary course of business. *See infra* text accompanying notes 36–39.

B.R. 969, 974–75 (Bankr.S.D.Ind.1988) (holding that section 2015 does not preempt the court's authority to determine the section 1225(a)(5)(B)(ii) discount rate).

Section 1225(a)(5)(B)(ii) grants the courts, not farm credit institutions, discretion to set an appropriate discount rate in a Chapter 12 plan. Sections 2001(c), 2015, and 2205 do not mention section 1225(a)(5)(B)(ii) or Chapter 12 plans, nor do these sections expressly stretch the definition of "loans" to encompass "allowed secured claims" or that of "interest rate" to include "discount rate." Furthermore, their legislative history [36] manifests no intention for the statutes to include the regulation of "discount rates" for "bankrupt borrowers."

Moreover, section 1225(a)(5)(B)(ii) on one hand, and sections 2001(c), 2015, and 2205 on the other, involve two different processes and implicate different policy considerations. Section 1225(a)(5)(B)(ii) permits the courts to set a discount rate which will ensure that the secured creditor will receive, at a minimum, the value of the creditor's secured claim. A court must consider the feasibility of the plan, the market rate of interest, the quality of the security, and the risk of default. *Cf.* 5 C. Cyr, H. Minkel, H. Sommer & W. Taggart, *Collier on Bankruptcy* ¶ 1129.03[4][f][i], at 1129–65 (15th ed. 1985) (discussing the analogous Chapter 11 provision).

Sections 2001(c) and 2015, by contrast, give the banks authority to set their own interest rates in order to assist them in meeting the dual tasks of providing affordable credit for farmers [37] and of preserving the adequacy of the banks' capital.[38] Section 2205 had permitted the FCA some control over new loans made in the ordinary course of business for the purpose of uniformity and preventing state usurpation of control over federal lending rates.[39]

In addition to the inapplicability of sections 2001(c), 2015, and 2205 to Chapter 12 plans, the Land Bank's argument based on section 2205 fails for three additional reasons. First, Congress amended section 2205 in 1986 in order to eliminate FCA control over interest rates.[40] The statute now provides, "Interest rates on loans from institutions of the Farm Credit System shall not be subject to any interest rate limitation imposed by any State constitution or statute or other laws." 12 U.S.C. § 2205 (1982 & West Supp.1989).[41] Thus, Congress removed the key language of the statute which had granted the FCA plenary power to regulate interest rates. Without such power, the FCA has no possible authority to bind the courts' determination of discount rates.

Second, Congress intended section 2205 to preempt *limitations* on interest rates which appear in various constitutions and

**36.** *See* H.R. Conf.Rep. No. 1012, 99th Cong., 2d Sess. 228–29 (1986) (history of section 2001(c)), *reprinted in* 1986 U.S.Code Cong. & Admin. News 3868, 3873–3874 [hereinafter "Conference Report"]; H.R.Rep. No. 593, 92d Cong., 1st Sess. (1971) (history of section 2015), *reprinted in* 1971 U.S.Code Cong. & Admin. News 2091, 2104; H.R.Rep. No. 1287, 96th Cong., 2d Sess. 22, 41–42 (section 2205), *reprinted in* 1980 U.S. Code Cong. & Admin. News 7095, 7105, 7124–7125; Conference Report, *supra,* at 230, 1986 U.S.Code Cong. & Admin. News at 3875 (section 2205).

**37.** *See* 12 U.S.C. § 2001(c) (Supp. IV 1986) (announcing Congressional policy "that the credit needs of farmers, ranchers, and their cooperatives are best served if the institutions of the Farm Credit System provide equitable and competitive interest rates to eligible borrowers"); Conference Report, *supra* note 36, at 228–29, 1986 U.S.Code Cong. & Admin. News at 3873–74.

**38.** *Cf.* 12 U.S.C. § 2154(a) (1982 & Supp. IV 1986) ("The Farm Credit Administration shall cause System institutions to achieve and maintain adequate capital by establishing minimum levels of capital ... and by using such other methods as the ... Administration deems appropriate.").

**39.** *See infra* text accompanying note 42.

**40.** The conference committee which considered this amendment stated that it wished to eliminate all references to the need for FCA approval of interest rates. Conference Report, *supra* note 36, at 230, 1986 U.S.Code Cong. & Admin. News at 3875.

**41.** Congress also amended 12 U.S.C. § 2015 to eliminate references to the need for FCA approval of land bank interest rates. *See* Conference Report, *supra* note 36, at 229, 1986 U.S. Code Cong. & Admin. News at 3874.

statutes.[42] In a bankruptcy case, though, the Code provides no "limitation" on rates which section 2205 could trump. Although a determination of a discount rate for use in section 1225(a)(5)(B)(ii) may result in a rate which is lower than that which the lender might charge in issuing a new loan, Congress did not intend section 1225(a)(5)(B)(ii) to be a "limitation" on interest rates, which courts might otherwise exceed in confirming a plan. Instead, section 1225(a)(5)(B)(ii) provides the authority for choosing a rate in the first place. Accordingly, old section 2205 would not be relevant to the establishment of discount rates.

Third, section 2205 applies only to *state* law limits on interest rates. The text permits preemption of state constitutions, statutes, or "other laws." The Land Bank claims that "other laws" not only includes state laws, but also federal laws such as Bankruptcy Code provisions. The legislative history of section 2205 shows a Congressional intent for federal farm credit laws to preempt state laws in this area, whether such limits appear in the state constitution, state statutes, or in other state sources. Since the words "other laws" appear in the context of federal preemption of state laws, it is clear that the expression "other laws" means "other state laws." Thus, it is not possible for 12 U.S.C. § 2205 to preempt 11 U.S.C. § 1225(a)(5)(B)(ii).

In conclusion, the statutes cited by the Land Bank are not germane here. They are relevant only to "interest rates" on "loans." Also, section 2205 had applied only to state law limits on interest rates before, in any event, Congress amended it to remove the language which arguably had supported the Land Bank's position. Thus, the Court holds that 12 U.S.C. § 2001(c), 12 U.S.C. § 2205, and 12 U.S.C. § 2015, now codified at 12 U.S.C. § 2016, do not limit the courts' discretion when determining the proper discount rate under 11 U.S.C. § 1225(a)(5)(B)(ii). *Accord In re*

---

42. *See* H.R.Rep. No. 1287, 96th Cong., 2d Sess. 22, 41–42 (1980), *reprinted in* 1980 U.S.Code

*Neff,* 89 B.R. 672, 676–77 (Bankr.S.D.Ohio 1988); *In re Caudill,* 82 B.R. 969, 974–75 (Bankr.S.D.Ind.1988).

### B. *Analysis of Section 1225(a)(5)(B)(ii)*

The Court has established that the farm credit laws do not require the bankruptcy court to adopt the interest rate which the Land Bank would charge for a new loan, here 12.5%, as the proper discount rate under 11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986). Thus, the Court cannot summarily affirm the court below as having adopted a rate which the law requires. Instead, this Court must remand the case, for it does not know whether the lower court's establishment of a 12.5% rate was a result of its acceptance of the erroneous argument that the farm credit laws required it to choose the Land Bank rate or whether it was a factual determination of the proper rate in accord with its legal determination as to the proper method of ascertaining discount rates. *Cf. In re Edward M. Johnson and Assocs., Inc.,* 845 F.2d 1395, 1401 (6th Cir. 1988) (ambiguity in or lack of findings by lower court necessitates remand). Before ordering this remand, however, the Court will provide some guidance to the bankruptcy court for further proceedings in this case, by presenting the proper method for determining discount rates under 11 U.S.C. § 1225(a)(5)(B)(ii), which the lower court can apply.

### 1. Introduction: The Various Methods for Calculating the Discount Rate

11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986) provides that the "value, as of the effective date of the plan," of the stream of payments provided in a bankruptcy plan to each secured creditor must equal the allowed secured claim. In other words, a bankruptcy court must calculate the "present" value of the proposed stream of payments using a chosen discount rate, where the "present" refers to the date of confirmation. The discounting means that the total amount the Shannons will pay

Cong. & Admin. News 7095, 7105, 7124–7125.

over time exceeds the amount they would pay if they transferred an amount equal to the entire secured claim to the Land Bank on the date of confirmation. This premium represents compensation for the delay experienced by the Land Bank in the payment of its allowed secured claim. That is, the premium reflects the time value of money.[43]

The bankruptcy court's task, then, is to set the amount of compensation to which the Land Bank is entitled by establishing a proper discount rate in some fashion. As a theoretical matter, a bankruptcy court has many options for setting an appropriate discount rate. The possible methods include: (1) using the legal or judgment rate, (2) utilizing a rate suggested by expert testimony, (3) setting an average or arbitrary rate, (4) reviving the rate established in the original, relevant contract, (5) ascertaining the current market rate for loans, given similar collateral and risks, (6) applying the IRS judgment rate set by 26 U.S.C. § 6621 (1982 & West Supp.1989), (7) employing the rate the creditor must pay to replace the funds, or (8) invoking the rate on government securities, which, for example, Congress did in setting the civil judgment rate set by 28 U.S.C. § 1961 (1982 & Supp. IV 1986).[44]

Some or all of these specific methods fall under two general approaches towards construing section 1225(a)(5)(B)(ii), the "coerced loan" theory and the "time value of money" approach. Under the time value approach, the court must strive to generate discount rates based upon the most current and accurate estimates of the present worth of a stream of payments. Since the purpose of the statute is to provide the secured creditors with compensation for the time value of their secured claims,[45] estimating the time value of money as accurately as possible would be a direct means of implementing the statute.

The specific methods which are appropriate under the time value approach include utilizing the legal or judgment rate, a rate based upon expert testimony, an average or arbitrary rate, the IRS judgment rate, a rate based on the cost of replacing funds, and a rate derived from government securities. These methods differ, then, only in the degree to which they accurately reflect the current time value of money.

The coerced loan approach, by contrast, is a more indirect way of implementing the statutory mandate, but is perhaps conceptually easier to understand and administer. It requires a court to treat a bankruptcy plan like a hypothetical new loan to be repaid over the duration of the plan. The amount of the secured claim would be the "principal" and the court must set an appropriate "interest" rate to determine what the periodic payments should be.[46]

Methods most appropriate for the coerced loan approach would be the use of the contract rate and the current market rate for similar loans with terms similar to the Chapter 12 plan. Some courts might use expert testimony, an averaging process, or the creditor's cost of funds to assess the current market rate for similar loans. Other courts may estimate a fair market rate for similar loans by using the prime or treasury bond rate as a base and

---

43. "Simply stated, 'present value' is a term of art for an almost self-evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence." 5 C. Cyr, H. Minkel, H. Sommer & W. Taggart, *Collier on Bankruptcy* ¶ 1129.03[4][f][i], at 1129–62 (15th ed.1985) [hereinafter "5 *Collier on Bankruptcy*"].

44. *See* Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L. Rev. 42 (1987).

45. *Id.* at 64 n. 194. Carbiener seems to endorse the time value of money approach in discussing

Chapters 11 and 13. *Id.* at 58 ("the discount rate is intended to reflect the time value of money"), 63, 64 n. 194.

46. The most widely-cited summaries supporting this theory are two passages in the seminal treatise, *Collier on Bankruptcy*. 5 *Collier on Bankruptcy, supra* note 43, ¶ 1129.03[4][f][i], at 1129–62 to –63, 1129–65. Oddly, another section in the treatise criticizes the coerced loan approach. *Id.* ¶ 1325.06[4][b][iii][B], at 1325–40 to –41. This section singled out the contract rate for criticism but cited disapprovingly a case which endorsed the market rate for similar loans. *Id.; see also infra* note 47.

adding to it an arbitrarily-chosen risk factor.

Having presented the two broad approaches taken by courts and the specific methods of generating discount rates that fall within them, the Court must now determine which of the theoretically possible methods a bankruptcy court must apply under section 1225(a)(5)(b)(ii).[47] The point of departure for this inquiry is the text of the statute itself. *See supra* note 8. If the statutory language mandates one of these methods, then the proper method of generating discount rates will be apparent.

### 2. The Statutory Language

Chapter 12 provides that "the court shall confirm a plan" if "with respect to each allowed secured claim provided for by the plan," the "value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986). That is, the present value of the payments received by the secured creditor must at least equal the value of the allowed secured claim.

Conspicuous by its absence is any mention of a method to determine the appropriate discount rate. It is not even possible to say whether the statutory text favors the coerced loan approach or the time value of money approach. Although the statutory language requires courts to ascertain the "present value" of an income stream, which relates directly to the time value of money, the process of determining the proper annual payment for a present value analysis is the mathematical equivalent of the process of adding interest to principal payments to set annual payments for a new loan.[48] Thus, the Court cannot foreclose the coerced loan approach as an option simply because it is an indirect approach for determining present value.

Accordingly, the Court cannot ascertain the proper method of calculating the discount rate from a simple examination of the plain language of the statute, nor does the statute even indicate which of the two broad approaches, the coerced loan theory or the time value theory, is appropriate. Thus, the Court must turn to the next step of the analysis, an interpretation of the relevant legislative history.

### 3. Legislative Intent

If the legislative history of section 1225 were to indicate that Congress favored a certain method for determining discount rates, the Court could rely on such a method in construing this statute. Unfortunately, the legislative history of section 1225[49] contains no express manifestation of an intended method of generating discount rates.

**47.** For a thoughtful, persuasive commentary on which methods are preferable as a matter of policy, see Carbiener, *supra* note 44; 5 *Collier on Bankruptcy, supra* note 43, ¶ 1325.06[4][b][iii][B]. Carbiener and the *Collier* author endorse the rate using the creditor's cost to borrowing. Carbiener states that this rate will often be identical to that based on a treasury bond rate plus a risk factor.

Carbiener also provides a cogent critique of the other possible methods. He states that the legal or judgment rate, the contract rate, and the IRS judgment rate are not responsive to current economic conditions. Also, measures based on expert testimony and on the current market rate for similar loans are not readily administrable. They both, one directly and the other indirectly, rely upon a court's evaluation of expert testimony. The use of such testimony entails delays and cost. It also means that irrelevant factors, such as the differential abilities of the parties to afford to hire experts, influence the determina-

tion. Also, the market rate for similar loans includes costs which should not be included in a Chapter 12 discount rate. Finally, utilizing an average or arbitrary rate is not acceptable since an accurate, administrable rate is available, the rate on government securities or the creditor's cost of funds. An approximation therefore would be needlessly inaccurate. Carbiener, *supra* note 44, at 59–63.

**48.** *See* Carbiener, *supra* note 44, at 45; 5 *Collier on Bankruptcy, supra* note 43, ¶ 1129.03[4][f][i], at 1129–62.

**49.** *See* H.R. Conf.Rep. No. 958, 99th Cong., 2d Sess. 50 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin. News 5246, 5251 [hereinafter "Conference Report"]; 132 Cong.Rec. S15,074–94 (Oct. 3, 1986) (floor statements of various Senators), *reprinted in* App. 3 *Collier on Bankruptcy* XXII–14 to –65 (L. King ed. 1987).

The legislative history does state, however, that Chapter 12 "is closely modeled after existing Chapter 13." [50] If the text and legislative history of the analogous provision in Chapter 13 evince a preference for one method of calculating a discount rate, then such an intent would assist the Court in interpreting section 1225(a)(5)(B)(ii).

Chapter 13 contains a provision identical to section 1225(a)(5)(B)(ii), namely 11 U.S.C. § 1325(a)(5)(B)(ii) (1982). The sameness of the two statutes means, however, that Congress failed to mention a preferred method of determining discount rates in both Chapter 12 and Chapter 13. The legislative pronouncements and reports concerning this provision [51] are also devoid of an express preference for a certain method.

The Court can assume, however, that the Congress which enacted Chapter 12 was cognizant of the case law interpreting Chapter 13. From the fact that Congress modeled section 1225(a)(5)(B)(ii) after section 1325(a)(5)(B)(ii), the Court infers that Congress intended the same meaning for both statutes. Accordingly, decisions interpreting section 1325(a)(5)(B)(ii) aid in the construction of section 1225(a)(5)(B)(ii). [52]

In interpreting section 1325(a)(5)(B)(ii), the United States Court of Appeals for the Sixth Circuit endorsed the coerced loan theory. "The theory of the statute is that the creditor is making a new loan to the debtor in the amount of the current value of the collateral." *Memphis Bank & Trust Co. v.*

*Whitman,* 692 F.2d 427, 431 (6th Cir.1982). The court also stated that "in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region." *Id.; see In re Colegrove,* 771 F.2d 119, 123 (6th Cir.1985). [53]

Although the Shannons are correct that since *Memphis Bank* is a Chapter 13 case, it is not a controlling precedent, Congress' apparent intent to apply Chapter 13 concepts and interpretations to Chapter 12 means that *Memphis Bank* provides an argument based on legislative intent that the current market rate is the proper rate under Chapter 12. The Court admits, though, that this argument is not dispositive and therefore must continue its analysis of legislative intent.

In enacting section 1225(a)(5)(B)(ii), Congress stated that a court must determine the "value, as of the effective date of the plan" of the stream of payments to each secured creditor. A provision in Chapter 11 utilizes the expression in the same context, the repayment of claims in bankruptcy plans. 11 U.S.C. § 1129 (1982 & West Supp.1989). The Court assumes that Congress intended this phrase to have a single meaning wherever used. *United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1288–89 (8th Cir.1986); *In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 652 n. 6 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). Thus, the language and legislative history

**50.** Conference Report, *supra* note 49 at 48, 1986 U.S.Code Cong. & Admin. News at 5249; *see, e.g., In re Snider Farms, Inc.,* 83 B.R. 977, 986 (Bankr. N.D.Ind.1988), *amended plan denied confirmation,* 83 B.R. 1003 (Bankr. N.D.Ind. 1988); 132 Cong.Rec. S15,076 (daily ed. Oct. 3, 1986) (statement of Sen. Grassley), *reprinted in* App. 3 *Collier on Bankruptcy* XXII–16, XXII–17 (L. King ed. 1987).

**51.** *See* S.Rep. No. 989, 95th Cong., 2d Sess. 142 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5928 [hereinafter "Senate Report"]; H.R.Rep. No. 595, 95th Cong., 1st Sess. 124, 430 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6085, 6385 [hereinafter "House Report"]; 124 Cong.Rec. S17,423 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini), *reprinted in* App. 3 *Collier on Bank-*

*ruptcy* X–13, X–48 (1988) [hereinafter "Statement of Sen. DeConcini"]; 124 Cong.Rec. H11,-107 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Admin. News 6436, 6550–6551 [hereinafter "Statement of Rep. Edwards"].

**52.** "Congress patterned § 1225(a)(5)(B)(ii) after § 1325(a)(5)(B)(ii). This leads us to conclude that it intended Chapter 13 cases to be precedents in similar Chapter 12 situations." *In re Hardzog,* 74 B.R. 701, 702 (Bankr. W.D.Okla. 1987), *modified on other grounds,* 77 B.R. 840 (Bankr. W.D.Okla.1987); *see In re Zurface,* 95 B.R. 527, 535 (Bankr. S.D.Ohio 1989).

**53.** *Colegrove* held, though, that the discount rate could be no higher than the contract rate. This limit would apply where the market rate for similar loans is higher than the contract rate.

of section 1129 is also relevant for determining a method of generating discount rates under section 1225(a)(5)(B)(ii).

The expression "value, as of the effective date of the plan" appears several times in section 1129. 11 U.S.C. § 1129(a)(7)(A)(ii), (a)(7)(B), (a)(9)(B)(i), (a)(9)(C), (b)(2)(A)(i)(II), (b)(2)(B)(i), (b)(2)(C)(i) (1982 & West Supp. 1989). Unfortunately, in none of these instances does the statute mention a preferred method for ascertaining discount rates. Moreover, the legislative history of section 1129 [54] contains no endorsement which might indicate the proper method of setting discount rates.

Case interpretation of section 1129, though, does show a majority rule for setting discount rates. The Courts of Appeals considering the proper discount rate under this issue adopted the market rate of interest for similar loans within the coerced loan theory.[55] Again, the Court presumes that the Congress enacting Chapter 12 was aware of the prevailing interpretation of section 1129 when it incorporated a phrase from it into section 1225(a)(5)(B)(ii). The Court can presume, then, that Congress intended the relevant phrase in section 1225(a)(5)(B)(ii) to have the same meaning as that in section 1129. Accordingly, the case law interpreting section 1129, approving the market rate for similar loans, is pertinent to section 1225(a)(5)(B)(ii). Like the argument under Chapter 13, though, this argument is not dispositive. It is some evidence of Congressional intent, but with-

out more, the Court believes that it is too slender a reed on which to base the instant decision.

As a matter of legislative history, then, Congress' adoption of the language of section 1325(a)(5)(B)(ii) in section 1225(a)(5)(B)(ii), which had used the operative phrase from section 1129, permits the Court to draw the weak inference that Congress intended to incorporate into Chapter 12 the standing interpretation of the identical language in analogous sections of Chapters 11 and 13, that the market rate for similar loans is the proper discount rate. This inference provides one argument for using the coerced loan theory and a market rate of interest for similar loans, but the Court does not find this argument to be conclusive. Accordingly, the Court will turn to case authority to determine if it corroborates this result.

### 4. Precedent

In the absence of a decisive argument on the basis of legislative history, the Court must now rely on case authority for guidance in evaluating the lower court's confirmation order. Unfortunately, the Court of Appeals for the Sixth Circuit has not yet decided a case under section 1225(a)(5)(B)(ii). Therefore, the Court has no binding precedent to follow. The Court notes, however, that numerous bankruptcy courts and courts from other jurisdictions have addressed the issue in Chapter 12 cases.[56]

---

54. *See* Senate Report, *supra* note 51, at 126–128, 1978 U.S.Code Cong. & Admin. News at 5912–5914; House Report, *supra* note 51, at 408, 412–418, 1978 U.S.Code Cong. & Admin. News at 6364, 6368–6374; Statement of Sen. DeConcini, *supra* note 51, at S17,420–22, App. 3 *Collier on Bankruptcy* at X–41 to –45; Statement of Rep. Edwards, *supra* note 51, at H11,103–05, 1978 U.S.Code Cong. & Admin. News at 6473–6477.

55. *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1505, 1508 (9th Cir.1987); *Neal Pharmacal,* 789 F.2d at 1285–86, 1289; *Southern States,* 709 F.2d at 651–53 & n. 7; *see In re Monnier Bros.,* 755 F.2d 1336, 1339 (8th Cir.1985) (citing treatise for proposition that "prevailing market rate" for similar loans was appropriate, but where only evidence of prevailing market rate was the contract rate,

court upheld lower court's choice of contract rate); *but see In re Pikes Peak Water Co.,* 779 F.2d 1456, 1457–59 (10th Cir.1985) (affirming choice of contract rate); *In re Burgess Wholesale Mfg. Opticians, Inc.,* 721 F.2d 1146 (7th Cir. 1983) (court mandated that lower court conduct present value analysis, but declined to name a method therefor).

56. Some courts, however, declined to specify a method to ascertain the proper discount rate. *Albaugh v. Terrell,* 93 B.R. 115, 116–17 (E.D. Mich.1988) (describing the mechanics of § 1225(a)(5)(B)(ii)); *In re Fenske,* 96 B.R. 244, 248 (Bankr.D.N.D.1988) (dictum) (explaining procedures under § 1225(a)(5)(B)(ii)); *In re Adam,* 92 B.R. 732, 735–36 (Bankr.E.D.Mich. 1988); *In re Paul,* 83 B.R. 709, 715–16 (Bankr.D. N.D.1988) (dictum) (court mentioning the procedures under § 1225(a)(5)(B)(ii)); *In re Land,*

A majority of courts stated that they had adopted a "market rate" of interest as the proper discount rate.[57] The courts, however, have not agreed on a method to measure or define a "market rate."[58] The split among the various courts in implementing the "market rate" standard portends a confusion between three different definitions of the term "market rate."

The most widely-held definition of "market rate" is the rate which regional lenders of similar loans, here agricultural lenders, would actually charge persons similarly situated to the debtor on the open market, absent the fact of bankruptcy, considering the payout time, the amount and quality of the collateral, and other risk factors.[59]

Some courts presumed that such a rate would be the creditor's own rate for borrowers in the debtor's position.[60] This "market rate" approach would fall under the coerced loan theory. *See supra* text accompanying note 46. Accordingly, at an evidentiary hearing conducted pursuant to this method, a court would hear testimony from experts or loan officers who would report what rate local and regional lenders would charge for agricultural loans to similarly situated borrowers.

Other courts, however, used "market rate" to refer to the prevailing rate for the time value of money within the time value theory.[61] *See supra* text accompanying

82 B.R. 572, 577 (Bankr.D.Colo.1988), *aff'd on other grounds,* 96 B.R. 310 (D.Colo.1988); *In re Bullington,* 80 B.R. 590, 596 (Bankr.M.D.Ga. 1987), *appeal denied on other grounds sub nom. Travelers Ins. Co. v. Bullington,* 89 B.R. 1010 (M.D.Ga.1988); *In re Herr,* 80 B.R. 135, 136 n. 2 (Bankr.S.D.Iowa 1987) (dictum); *In re Mason,* 70 B.R. 757, 759 (Bankr.W.D.N.Y.1987) (dictum) (court reciting procedures under § 1225(a)(5)(B)(ii)).

57. Some courts, though, endorsed the contract rate, at least where it was lower than the market rate. *See In re Doud,* 74 B.R. 865, 870–72 (Bankr. S.D.Iowa 1987) (where notes to be repaid under plan were subsidized Farmers Home Administration loans, FmHA policy would be thwarted by using a market rate which was higher than contract rate; thus, the court adopted the contract rate), *aff'd sub nom. United States v. Doud,* No. 87–577–B, 1987 WL 46813 (S.D. Iowa Dec. 4, 1987), *aff'd on other grounds,* 869 F.2d 1144 (8th Cir.1989); *see also In re Turner,* 87 B.R. 514, 517–18 (Bankr. S.D.Ohio 1988); *In re Simmons,* 86 B.R. 160, 162–63 (Bankr. S.D.Iowa 1988); *In re Bartlesmeyer,* 78 B.R. 975, 977 (Bankr. W.D.Mo.1987) (adopting the *Doud* reasoning); *cf. In re Colegrove,* 771 F.2d 119, 123 (6th Cir.1985) (under Chapter 13).

58. Some courts endorsed a "market rate" but did not mention a means of ascertaining it. *In re Bar L O Farms, West,* 87 B.R. 125, 126–27 (Bankr. D. Idaho 1988) (adding a risk factor to a base rate which was established by an ad hoc consideration of prime rate, treasury rates, and mortgage rates); *In re Turner,* 87 B.R. 514, 517–18 (Bankr. S.D.Ohio 1988); *In re Krump,* 89 B.R. 821, 825, 826 (Bankr. D.S.D.1988); *In re Weldin–Lynn, Inc.,* 79 B.R. 409, 412–13 (Bankr. E.D.Ark.1987); *In re Rivera Sanchez,* 80 B.R. 6, 8 (Bankr. D.P.R.1987); *In re Lenz,* 74 B.R. 413, 416–17 (Bankr. C.D.Ill.1987).

59. *In re Miller,* 98 B.R. 311 (Bankr. N.D.Ohio 1989); *In re Butler,* 97 B.R. 508, 513 (Bankr.

E.D.Ark.1988); *In re Rott,* 94 B.R. 163, 168–69 (Bankr. D.N.D.1988), *modifying* 73 B.R. 366, 374 (Bankr. D.N.D.1987); *In re Batchelor,* 97 B.R. 993 (Bankr. E.D.Ark.1988); *In re Townsend,* 90 B.R. 498, 500 (Bankr. M.D.Fla.1988) (implicit holding); *In re Neff,* 89 B.R. 672, 679 (Bankr. S.D.Ohio 1988), *modified,* 96 B.R. 800, 803–04 (Bankr. S.D.Ohio 1989); *In re Kloberdanz,* 83 B.R. 767, 771–72 (Bankr. D.Colo.1988); *In re Smith,* 78 B.R. 491, 492–93 & n. 5 (Bankr. N.D. Tex.1987); *In re Claeys,* 81 B.R. 985, 989–90, 993–94 (Bankr. D.N.D.1987); *In re Robinson Ranch, Inc.,* 75 B.R. 606, 610 (Bankr. D. Mont. 1987); *In re Edwardson,* 74 B.R. 831, 836 (Bankr. D.N.D.1987); *see also In re Indreland,* 77 B.R. 268, 274 (Bankr. D. Mont.1987) (dictum) (holding that length of plan should reflect current market terms for similar farm loans, stating in dictum that rate should be the same too); *cf. In re Kesterson,* 94 B.R. 561, 562–63 (Bankr. W.D.Ark.1988) (where debtors eligible for FmHA limited resource program, appropriate discount rate was FmHA's current market rate); *In re Schaal,* 93 B.R. 644, 646–47 (Bankr. W.D. Ark.1988) (FmHA rate appropriate as in *Kesterson* ).

60. *In re Konzak,* 78 B.R. 990, 992 (Bankr. D.N.D. 1987); *In re Citrowske,* 72 B.R. 613, 617 (Bankr. D. Minn.1987); *cf. In re Claeys,* 81 B.R. 985, 989–90, 993–94 (Bankr. D.N.D.1987) (creditor's testimony best reflects market rate but court adjusted rate due to lowered risk in Chapter 12 bankruptcy; also court chose rate partly because it was analogous to junk bond rate); *In re O'Farrell,* 74 B.R. 421, 424 (Bankr. N.D. Fla. 1987) (court chose market rate within range of rates available from creditor land bank due to land bank's traditionally favorable rates and its large volume of loans).

61. Other cases fall within the time value of money theory, but cannot be said to endorse the "market rate." One court used the creditor's

note 45. These courts utilized as a base rate a generally-applicable measure of interest capable of accurate and ready determination, such as the prime rate or the rate on United States Treasury bonds.[62] This base rate signifies the risk-free component of the discount rate. Under this approach, a court would conduct a factual hearing for the sole purpose of assessing the risks peculiar to the debtor and the quality of the collateral in order to add an appropriate risk factor to the risk-free component. The resulting sum, then, would be the appropriate discount rate.

A third meaning of "market rate" is theoretically viable and can exist within the framework of the coerced loan theory. Some courts stated or implicitly subscribed to the view that the repayment of a secured claim is like a hypothetical new loan, but a bankruptcy court must nevertheless set a fair discount rate. The going rate among local or regional lenders includes profits as well as administrative, collection, and transaction costs, elements which are not appropriate for a bankruptcy discount rate. Accordingly, the "market rate" in the first sense of the term would overstate the proper discount rate.

Courts subscribing to this third definition of market rate, however, found it difficult to calculate an accurate market rate by simply subtracting the costs inappropriate to bankruptcy from the going rate among local or regional lenders. In order to avoid this difficulty, these courts used a surrogate measure of interest. They utilized a risk-free base rate, such as the prime [63] or a treasury rate,[64] and added a risk factor to it.[65] A factual hearing under this approach would again elicit evidence relevant only to the assessment of the risk factor.

The one Court of Appeals to interpret section 1225(a)(5)(B)(ii), *United States v. Doud*, 869 F.2d 1144 (8th Cir.1989), does not clearly support any of the three definitions of "market rate." *Doud* purported to follow prior Eighth Circuit cases decided under 11 U.S.C. § 1129 (1982) which had endorsed the first sort of "market rate," the going rate among local lenders for sim-

---

cost of funds. *In re Hardzog*, 74 B.R. 701, 703–04 (Bankr. W.D. Okla.1987), *modified*, 77 B.R. 840, 841–43 (Bankr. W.D. Okla.1987). Another court seems to have endorsed the time value theory, but did not mention a preferred method of determining it. *In re Hochmuth Farms, Inc.*, 79 B.R. 266, 269 (Bankr. D. Md.1987) ("it is sufficient that the discount rate reflects the collateral's interest-earning capacity"; court stated in dictum that factors to be considered included the prime rate and rates established for commercial paper, certificates of deposit, and U.S. Treasury bills).

62. *In re Underwood*, 87 B.R. 594, 598–601 (Bankr. D. Neb.1988); *In re Caudill*, 82 B.R. 969, 978–81 (Bankr. S.D. Ind.1988); *In re Bergbower*, 81 B.R. 15, 16 (Bankr. S.D. Ill.1987); *In re Wichmann*, 77 B.R. 718, 720–21 (Bankr. D. Neb. 1987).

63. *In re Patterson*, 86 B.R. 226, 228 (9th Cir.BAP 1988); *In re Chaney*, 87 B.R. 131, 133–34 (Bankr. D. Mont.1988); *In re Big Hook Land & Cattle Co.*, 81 B.R. 1001, 1004–06 (Bankr. D. Mont.1988), *modifying* 77 B.R. 793, 796 (Bankr. D. Mont.1987); *In re Fowler*, 83 B.R. 39, 41–43 (Bankr. D. Mont.1987); *In re Cool*, 81 B.R. 614, 619–20 (Bankr. D. Mont.1987); *In re Paddock*, 81 B.R. 51, 52–54 (Bankr. D. Mont.1987); *In re Foster*, 79 B.R. 906, 911–12 (Bankr. D. Mont. 1987), *amended plan confirmed*, 84 B.R. 707 (Bankr. D. Mont.1988); *In re Martin*, 78 B.R. 598, 599–601 (Bankr. D. Mont.1987); *In re Jans-*

*sen Charolais Ranch, Inc.*, 73 B.R. 125, 127–28 (Bankr. D. Mont.1987) (denying confirmation), *amended plan confirmed*, 83 B.R. 743 (Bankr. D. Mont.1987).

64. *United States v. Doud*, 869 F.2d 1144, 1145–46 (8th Cir.1989); *In re Simmons*, 86 B.R. 160, 162 (Bankr. S.D. Iowa 1988); *In re Snider Farms*, 83 B.R. 977, 992–96, 998 (Bankr. N.D. Ind.1988), *amended plan denied confirmation*, 83 B.R. 1003, 1005–06 (Bankr. N.D. Ind.1988); *In re Bartlesmeyer*, 78 B.R. 975, 976–78 (Bankr. W.D. Mo.1987) (using the treasury rate unless the contract rate were lower).

65. Perhaps this is the most candid approach within the coerced loan theory. Many courts have doubted whether it is really possible to determine what a lender would charge in the open market for a similar loan. There may be no equivalent of a bankruptcy plan, in which the amount of the "loan" equals 100% of the value of the collateral; and real lenders may not be willing to loan money to persons in the debtors' situation at all. *See, e.g., In re Neff*, 96 B.R. 800, 803 (Bankr. S.D. Ohio 1989); *In re Turner*, 87 B.R. 514, 517 (Bankr. S.D. Ohio 1988). The coerced loan theory, then, has an inherently hypothetical nature to it. Therefore, it is perhaps better to be expressly hypothetical and use a surrogate rate in an effort to be fair rather than to be implicitly hypothetical and pay lip service to an actual coerced loan rate.

ilar loans. *Id.* at 1145, 1146. The court did, however, note with some approval, *id.* at 1145–46, cases which expressly criticized the market rate for similar loans and which subscribed to the second sense of "market rate," the best estimate of the time value of money, *see* cases cited *supra* note 62. In the end, it affirmed the lower courts' adoption of a rate based on treasury bonds with an added risk factor.

Nevertheless, the *Doud* opinion fits best within the third meaning of "market rate." It followed the prior decisions of the Eighth Circuit in endorsing the coerced loan theory, but noted the valid concerns of the bankruptcy court that the market rate for similar loans may include elements inappropriate to bankruptcy discount rates. *See supra* notes 63–65 and accompanying text. Accordingly, it affirmed the use of a surrogate rate consisting of a treasury bond risk-free rate plus a risk factor.

Although the *Doud* approach of choosing a rate based on treasury bonds is an appealing option, the Court does not find the case to be persuasive here. Indeed the case authority, as it applies to this Circuit, better supports the market rate for similar loans among local and regional lenders for three reasons. First, despite the *Doud* court's concerns, more courts interpreting section 1225(a)(5)(B)(ii) endorsed the market rate for similar loans within the coerced loan theory than any other method. *See* cases cited *supra* notes 59–60.

Second, the Court of Appeals for the Sixth Circuit has stated that "in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region." *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982);

*see In re Colegrove,* 771 F.2d 119, 123 (6th Cir.1985).[66] The *Memphis Bank* court was interpreting section 1325(a)(5)(B)(ii), but its broad holding arguably extends to Chapter 12 cases, *see In re Miller,* 98 B.R. 311 (Bankr.N.D.Ohio 1989); *In re Kratz,* 96 B.R. 127, 131 (Bankr.S.D.Ohio 1988); *In re Neff,* 89 B.R. 672, 677 (Bankr.S.D.Ohio 1988), *modified on other grounds,* 96 B.R. 800 (Bankr.S.D.Ohio 1989).[67] Since *Memphis Bank* stated that "bankruptcy courts" should apply the market rate for similar loans, one inference is that the court was referring to all bankruptcy courts undertaking present value analyses, whether under Chapter 11, 12, or 13. Certainly, the Court did not expressly limit its holding to cases under Chapter 13.

Third, even if the Sixth Circuit expressly had limited its pronouncement in *Memphis Bank* to cases under Chapter 13, the decision would nonetheless be persuasive. Section 1325(a)(5)(B)(ii) and section 1225(a)(5)(B)(ii) are identical in purpose and function. Controlling cases under statutes analogous to the one under consideration provide some guidance in the instant suit. For this reason as well, then, the Sixth Circuit's choice of the market rate for similar loans is compelling.

Finally, a majority of the Courts of Appeals interpreting section 1129, which governs an analogous present value analysis, endorsed the coerced loan theory and the market rate among local and regional lenders for similar loans. *See* cases cited *supra* note 55. In fact, among these cases were two decisions issued by the Eighth Circuit.[68]

In sum, although *Doud* approved of a rate based on treasury bonds, the Court declines to follow it. Given the Sixth Cir-

---

**66.** *Colegrove,* however, held that the market rate is appropriate if and only if it is lower than the contract rate. If not, the contract rate is appropriate. *Id.*

**67.** *Kratz* and *Neff* correctly noted that *Memphis Bank* is relevant in the interpretation of § 1225(a)(5)(B)(ii), though they did overstate the case by claiming that *Memphis Bank* makes it "undisputed" that using the market rate for similar loans is the proper method. *Id.*; *Kratz,* 96 B.R. at 131.

**68.** Although *Doud* and these cases both endorsed the coerced loan approach, the *Doud* court's choice of a treasury bond rate is not consistent with the prior Eighth Circuit opinions endorsing the market rate for similar loans, *United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285–86 (8th Cir.1986); *In re Monnier Bros.,* 755 F.2d 1336, 1339 (8th Cir.1985).

cuit's broad holding in *Memphis Bank*, this Court must conclude that the law in this Circuit requires bankruptcy courts to adopt as the proper discount rate under Chapter 12 the market rate of interest charged by regional and local lenders for similar loans. This conclusion draws support from the fact that this approach is the most widely-held among the courts in various jurisdictions. The Court is also mindful that the Courts of Appeals addressing Chapter 11, and the Sixth Circuit in deciding a Chapter 13 case, chose the same method.

### 5. Conclusion

To determine the proper discount rate to apply to payments made under Chapter 12 plans, the Court examined the statutory text; the legislative history of the relevant statute, 11 U.S.C. § 1225(a)(5)(B)(ii) (Supp. IV 1986); and the applicable case law. Although the statutory text demonstrates no preferred method of setting discount rates, some aspects of the legislative history suggest that Congress intended for the current interpretation of analogous Chapter 11 and 13 sections to apply, which is that the market rate of interest for similar loans among lenders in the region is the appropriate rate. Moreover, the case authority pertinent to this issue, although not controlling, does support the market rate for similar loans.

Therefore, the Court now holds that the appropriate method for setting discount rates under section 1225(a)(5)(B)(ii) is to ascertain the market rate for similar loans among regional and local lenders pursuant to the coerced loan theory. In applying this market rate, a case-by-case process, the bankruptcy courts should hold factual hearings, at which bank officials or expert witnesses could testify as to what rate local and regional lenders are charging for agricultural loans, given similar terms and conditions. Such terms and conditions would include the length of the plan, the amount and quality of the collateral, and any relevant risk factors in the case.[69]

The determination of risk factors is a case-specific enterprise. Nevertheless, the bankruptcy court may wish to consider, among other things, "multiple bankruptcy reorganization attempts" not counting the instant proceedings, "lack of good faith in dealing with the creditor, unusual risk to the value of the real property securing the loan, lack of insurance, or other factors especially relevant to the particular conduct." *In re Neff*, 89 B.R. 672, 679 (Bankr. S.D.Ohio 1988), *modified on other grounds*, 96 B.R. 800 (Bankr.S.D.Ohio 1989).

The future risk of default inherent in agricultural loans in general is also germane. Accordingly, the court may consider "the unpredictable nature of the agricultural economy itself." *In re Doud*, 74 B.R. 865, 869 (Bankr.S.D.Iowa 1987), *aff'd sub nom. United States v. Doud*, No. 87–577–B (S.D.Iowa Dec. 4, 1987), *aff'd*, 869 F.2d 1144 (8th Cir.1989). The court should, however, also recognize that the risks are somewhat diminished due to the administrative aspects of Chapter 12 plans. Since a trustee oversees the affairs of the debtor, administrative and collection costs are lower. Furthermore, the confirmation of a Chapter 12 plan implies that the debtors have convinced the bankruptcy judge that the plan is feasible. *Id.* The fact that the plan overcame such a hurdle heightens the probability of repayment.

Having presented the proper method for determining discount rates under Chapter 12, the Court turns to the case at bar. Again it is not certain whether the bankruptcy court adopted a 12.5% rate due to the erroneous legal view that the farm credit laws mandate such a rate or whether the rate was a factual determination based on a method of determining discount rates under section 1225(a)(5)(B)(ii). Accordingly, the Court must remand this action.

WHEREUPON, upon consideration and being duly advised, the Court AFFIRMS in part the bankruptcy court insofar as it excluded from the Plan provisions for the surrender and retirement of the Land Bank stock. The Court, however, VACATES the confirmation order, since the bankruptcy

---

**69.** *See* 5 *Collier on Bankruptcy, supra* note 43, ¶ 1129.03[4][f][i], at 1129–65.

court's pronouncement regarding the establishment of a discount rate under 11 U.S.C. § 1225(a)(5)(B)(ii) is based on ambiguous grounds. Therefore, the Court REMANDS the case for determination of the proper discount rate, and for possible confirmation, in a manner which is consistent with this Opinion and Order.

IT IS SO ORDERED.